U.S. DISTRICT COURT
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED FOR DOCKETING
JUL 25

JUAN T. GONZALEZ, SERGIO GONZALES,     )
MARIA L. LLAMES, LINO RUBIO, RAFAEL    )
CRUZ, NICOLAS PEDRO, FELIPE FLORES, and )
all others similarly situated,          )
                                        )          No. 00 C 8062
        Plaintiffs,                     )
                                        )          Judge Anderson
    v.                                  )
                                        )          Magistrate Judge Levin
FARMINGTON FOODS, INC.                  )
                                        )
        Defendant.                      )

DOCKETED
JUL 3 0 2003

FILED
JUL 2 2 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**PLAINTIFFS' LR56.1(b)(3) STATEMENT**

**PLAINTIFFS' LR56.1(b)(3)(A) RESPONSE TO DEFENDANT'S
STATEMENT OF FACTS**

NOW COMES Plaintiffs Juan T. Gonzalez, Sergio Gonzales, Maria L. Llames, Lino Rubio,

Rafael Cruz, Nicolas Pedro, Felipe Flores, and all others similarly situated (collectively referred to

as "Plaintiffs") and, pursuant to LR56.1(b)(3)(A), respond to Defendant Farmington Foods, Inc.'s

("Farmington Foods" or "the Employer") LR56.1(a) Statement of Facts as follows:

1.      Farmington owns and operates a meat processing plant within the jurisdiction of this
court (Forest Park, Illinois), in which it de-bones, trims and packages pork loins for resale to hotels,
restaurants, and grocery stores. (LaValle affidavit -- Se Amended Exhibit # 8 attached).

**RESPONSE**:        Admit.

2.      Farmington has approximately 140 employees, of which approx. 46 are pork boners
and trimmers (individuals who mainly use sharp knives to de-bone and trim meat) (Ramirez Depo.
-- See Exhibit #5 attached to transcript) (See also Mizaur Depo. at 83)

**RESPONSE**:        Plaintiffs move to strike the first portion of Paragraph No. 2, that

Farmington has approximately 140 employees, as unsupported by the record. Defendant cites to

Exhibit No. 5 of Ramirez' deposition, yet no Exhibit 5 is included within, and the second cite

contains no information regarding the total number of employees at Farmington Foods. Plaintiffs admit the remainder of Paragraph 2.

3.      This group has been conditionally certified as the "Safety Equipment" Class by the court. (Plaintiff's "Important Notice Regarding Pendency of Class and Collective Action Lawsuit" filed August 2001, Approved in open court August 8, 2001.)

**RESPONSE**:           Admit.

4.      The balance of employees, approx. 100 general laborers, weigh, package, and ship pork products. (LaValle Affidavit -- See Amended Exhibit # 8 attached)

**RESPONSE**:           Admit.

5.      This group has been conditionally certified as the "Laborer Class" by the court. (See Notice and approval in para. 3 above.)

**RESPONSE**:           Admit.

6.      The laborers have always been paid on an hourly basis. The pork boners and trimmers were primarily paid on a piece rate basis prior to June 1999, but thereafter are paid on an hourly basis. (LaValle Depo. at 13-14).

**RESPONSE**:           Plaintiffs understand Paragraph 6 to address only the method by which Farmington Foods calculates wages, not the issue as to whether the laborers, pork boners and trimmers received pay for work performed, which lies at the heart of this lawsuit. Subject to this proviso, Plaintiffs admit.

7.      Farmington pays its employees in quarter hour increments. That is, the employee's time is rounded to the nearest quarter hour. (LaValle Depo. at 14, 16, 19-33).

**RESPONSE**:           Deny. (LaValle Jr. Dep., p. 19-21); see also Plfs.' LR56.1(b)(3)(B) Statement of Facts ¶¶ 21, 22, 27, 28, 49.

8.      At all relevant times, Plaintiffs are or were members of Local 546100-A, [sic] United Food and Commercial Workers International Union, AFL-CIO-CLC (formerly Local 100-A, until July 2001) and entered into successive collective bargaining agreements (hereinafter "the

2

Union") (Ramirez Depo. at 11) (See also recent collective bargaining agreements -- Exhibit 8) (LaValle affidavit -- attached to Amended Exhibit 8).

**RESPONSE**:        Admit.

9.    Javier Ramirez, the Union's Director of Organizing, is the primary business agent (Ramirez Depo. at 12).

**RESPONSE**:        Admit.

10.    Laborers typically wear only hard hats, frocks (white smocks), plastic aprons and cotton gloves (Venegas Depo. at 33-43).

**RESPONSE**:        Deny.  Laborers wear a helmet, hair net, frock, boots and four layers of gloves: a cotton glove, a plastic glove, a mesh glove, and another plastic glove.  (Venegas Dep., pp. 34, 36).

11.    In addition to these items, boners and trimmers utilize other forms of equipment, including an arm guards, [sic] hook, knives, plastic gloves, mesh glove, and belly guard (Gonzalez Depo. 21-29)

**RESPONSE**:        Admit in part and deny in part.  Boners and trimmers wear a helmet, a frock, an arm guard on one arm, a plastic sleeve on one arm, knives, a knife holder, a chida (a piece of steel used to sharpen the knives), a hook, a belly guard, a plastic apron, and four pairs of gloves:  a cotton glove, a plastic glove, a mesh glove and another plastic glove.  (Venegas Dep., pp. 22-29; Ingalls Time Study Report, at p.1-2)

12.    Plaintiffs' expert, Jerry ingalls, conducted several time studies with a stop watch over the course of 3-4 days.  He did not do any time studies of laborers, just boners and trimmers. His results for the cumulation of preparatory and concluding activities, including walking time was 14.6 minutes per day.  Excluding walking time, his study showed 12.6 minutes per day. (Ingalls Time Study Report).

**RESPONSE**:        Admit.

3

13.     The expert retained by Farmington, Mr. Albert Swarts, found using a predetermined time system called MODAPTS, that the time for the preparatory and concluding activities, excluding walking time, was 5.921 minutes (Swarts Report, dated May 21, 2001).

**RESPONSE**:          Admit.

### PLAINTIFFS' LR56.1(b)(3)(B) STATEMENT OF ADDITIONAL FACTS

NOW COMES Plaintiffs Juan T. Gonzalez, Sergio Gonzales, Maria L. Llames, Lino Rubio, Rafael Cruz, Nicolas Pedro, Felipe Flores, and all others similarly situated (collectively referred to as "Plaintiffs") and, pursuant to LR56.1(b)(3)(B), assert additional facts to show genuine issues of material facts exist precluding entry of summary judgment in this matter:

### BACKGROUND

1.     Albert LaValle, Jr. is the Employer's Director of Finance.  (Plfs. Exh. A, LaValle, Jr. Dep., p.5)

2.     Ron Mizaur is the Production Manager.  (Plfs. Exh. B, Mizaur Dep., p.7)  Juan Velasquez, Ismael Venegas, and Juan Vieyra report to him.  (Id.)

3.     Juan Vieyra is a supervisor; he is Mizaur's assistant.  (Plfs. Exh. C, Vieyra Dep., p.8)

4.     Ismael Venegas supervises the laborers.  (Plfs. Exh. D, Venegas Dep., p.9, 14)

5.     Juan Velasquez supervises the boners and trimmers.  (Plfs. Exh. E, Velasquez Dep., p.8, 13)

6.     The plant runs five days per week, and occasionally on Saturdays.  (Plfs. Exh. D, Venegas Dep., p.15)  There is one shift.  (Id.)

7.     The plant processes pork.  (Plfs. Exh. D, Venegas Dep., p.28)

8.     Generally, laborers place meat on a conveyor belt and boners and trimmers cut the meat. (Plfs. Exh. D, Venegas Dep., p.21; Plfs. Exh. E, Velasquez Dep., p.21-22)

9.     Velasquez starts the production line each morning.  (Plfs. Exh. C, Vieyra Dep., p.27-28)  The employees know the line has started when a bell rings; the bell can be heard throughout the plant. (Plfs. Exh. D, Venegas Dep., p.28-29)

4

## THE COMPANY'S TIME RECORDS

10.     Throughout the relevant time period, the Employer has kept track of employees' time using a computer system known as Kronos. (Plfs. Exh. A, LaValle, Jr., Dep., p.6) Kronos is a computer software program which electronically tracks employee time and attendance. (Id. p.10)

11.     An employee uses a card to swipe in and out of a clock connected to the Kronos system. (Plfs. Exh. A, LaValle, Jr. Dep., p.16)

12.     The Kronos system records, to the minute, when an employee swipes in or out. (Plfs. Exh. A, LaValle, Jr. Dep., p.18-19)

13.     The Kronos system allows the Employer to generate a report known as a punch detail report. (Plfs. Exh. A, LaValle, Jr. Dep., p.9)

14.     The punch detail report shows each employee's swipe in and swipe out time, and shows for how many hours and minutes the employee was paid. (Plfs. Exh. B, Mizaur Dep. p.35)

15.     The only company records which reflect when an employee is at the plant and available for work is the punch detail report and the Kronos report. (Plfs. Exh. B, Mizaur Dep. p.44)

16.     The employees' paychecks are generated from the Kronos system. (Plfs. Exh. A, LaValle Jr., Dep., p.10; Plfs. Exh.F, Brown I Dep., p.36-37)[1]

## THE EMPLOYER'S CREDIBILITY

17.     The Employer produced a punch detail report during the deposition of Albert LaValle, Jr. (Plfs. Exh. G)

17. The punch detail report the Employer produced during LaValle's deposition shows

the time an employee swipes in and the time an employee swipes out for one day,

October 31, 2001. (Plfs. Exh. G) For example, Antonio Mendoza is the third

---

[1] The Employer's Payroll Manager was deposed twice. Her first deposition, taken on November 1, 2001, will be referred to as "Brown I Dep.," and her second deposition, taken on October 9,

employee listed on page two of Exhibit G, and the entire entry under his name appears

as follows:

MENDOZA, ANTONIO                    1120          4320    20      Union100Hourly

Late In: 1,0                        Late Out: 1,0
Reg. 8.00                           OVT: 4.50                     MEALALOW: $2.50

| ID | IN | Dept | C1 | ACTIVITY | OUT | ID | IN | Dept | C1 | ACTIVITY | OUT | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wed 10/31 | 506a*L | | | | 604p*L | | | | | | | 12.50 12.50 |

Acct: 4320 20

|  |  |  |  |
|---|---|---|---|
|         | REG: 8.00 | OVT: 4.50 | MEALALOW: | $2.50 |
| Totals: | REG: 8.00 | OVT: 4.50 | MEALALOW: | $2.50 |

(Plfs. Exh. G)

19.     However, the punch detail reports the Employer produced a second time were

substantially different than the punch detail report the Employer produced during LaValle's

deposition. (Plfs. Exh. J, Huebsch Dep. Exh. 1) For example, the second set of punch detail

reports shows the following additional information regarding the employee Antonio Mendoza for

the week of October 28, 2001 through November 3, 2001 is as follows:

MENDOZA, ANTONIO                    1120   4320   20    Union100Hourly

| | IN | | | OUT | | TOTALS | |
|---|---|---|---|---|---|---|---|
| Sun 10/28 | Unscheduled | | | | | | |
| Mon 10/29 | 500a | | | 419p*L | | 10.75 | 10.75 |
| Tue 10/30 | 500a | | | 517p*L | | 11.75 | 22.50 |
| **Wed 10/31** | **515a*L** | | | **604p*L** | | **12.25** | **34.75** |
| Thu 11/01 | 453a | | | 534p*L | | 12.00 | 46.75 |
| Fri 11/02 | 454a | | | 531p*L | | 12.00 | 58.75 |
| Sat 11/03 | 454a | | | 430p*L | | 11.00 | 69.75 |
| **Add Punch** | 44 | 10/29 | 500a | | | | |
| **Remove Punch** | 44 | 10/30 | 524p | | | | |
| **Remove Punch** | 44 | 10/31 | 506a | | | | |

---

2002, will be referred to as "Brown II Dep."

6

| Add Punch | 44 | 10/31 | 515a |
|---|---|---|---|
| Remove Punch | 44 | 11/01 | 502a |
| Remove Punch | 44 | 11/01 | 507a |

(Plfs. Exh. J, Huebsch Dep. Exh. 1, at Bates No. 6342) (emphasis added)

20.     Thus, Mendoza's recorded starting time entry for October 31, 2001 differs between the punch detail report produced during LaValle's deposition and the punch detail reports later produced. (Compare Plfs. Exh. G with Plfs. Exh. J)

21.     The punch detail report the Employer produced during LaValle's deposition shows Mendoza was paid for 12.5 hours of work on October 31, 2001. (Plfs. Exh. G, at p.2) The later produced punch detail reports show Mendoza was paid for 12.25 hours of work on October 31, 2001. (Plfs. Exh. J, at Bates No. 6342)

22.     The sequence of "Add Punch" and "Remove Punch" entries appearing under Mendoza's name appear repeatedly for the majority of employees in the later produced punch detail reports. (See, e.g., Plfs. Exh. J, Huebsch Dep. Exh. 1) Such entries do not appear in the punch detail report produced during LaValle's deposition. (Plfs. Exh.G)

23.     Donna Brown, Defendant's payroll manager and the only one who does payroll for Defendant, testified during her first deposition that she did not change employees' time entries. (Plfs. Exh. F, Brown I Dep., p. 22-23, 27-29)

24.     During her first deposition, Brown was asked how the Employer's time system automatically rounds up or down an employee's time to the nearest quarter hour:

Q:      Using Mr. Schumann's terminology, if I swipe in at 7:54 and I swipe out at 3:06, so from 7:00 to 3:00 we have got eight hours less the half hour for lunch time, right, are you following me, or am I losing you?
A:      You're losing me. Rephrase your question.
Q:      I'll go back to -- the rounding occurs on each end separately?
A:      Yes.

7

Q:      You don't just simply take the swipe times, subtract them and subtract a half hour to figure out the total time?

A:      I don't figure out the total time.

Q:      How is that figured out?

A:      That is figured out in the system.

Q:      And in terms of --

A:      **And I would not alter anyone's time with those swipes that you used for an example.**

Q:      **When you say you wouldn't alter them, what do you mean?**

A:      **I wouldn't — you're insinuating that I put it to 8:00 o'clock to 3:00 o'clock. I don't touch those times.**

Q:      **I'm not attempting to insinuate anything. I'm asking how the procedure works.**

A:      **That's what you stated, and I don't touch those.**

Q:      So when you say you don't touch those, somebody somewhere has set up the parameters in a computer system?

A:      Absolutely, and I don't know who.

(Plfs. Exh. F, Brown I Dep., pp. 22-23) (emphasis added)

25.     Again, when asked about the butchers' starting and ending times, Ms. Brown stated:

Q:      If Mr. Vieyra says the line was running from 6:00 a.m. to 2:00 p.m., and there was a half hour lunch, what do you put in that Kronos system as far as the hours that are worked by the butchers?

A:      Their swipe in is done through Kronos. What they swiped in through their swipe card is what is recorded on the punch detail. Their swipe out is done the same exact way. Whenever they swiped out is recorded on the punch detail.

Q:      But obviously they don't all swipe in and swipe out at exactly the same time?

A:      That's absolutely correct.

Q:      Some employees may swipe in at, in my example, 5:54, some at 5:55 a.m. The line starts at 6:00. What triggers the start -- what is the starting time for the purposes of figuring out their pay that day, the time they swipe in, or 6:00 o'clock when that line starts operating?

A:      Okay. May I explain something to you? When they swipe in at 5:54 it goes to the closest quarter of the hour, which is 6:00 o'clock, so 6:00 o'clock is their figured time for their payroll purposes, **but I don't edit those hours, those minutes.** They are on the punch detail as 5:54.

Q:      And if they swipe out after 2:00 o'clock, but the line stops at 2:00, are the butchers only paid for that 6:00 o'clock to 2:00 o'clock time less a half hour for lunch, or do they get the actual swipe out time which could be several minutes later?

8

A:     I believe I stated it's seven minutes either way, front or back, so **I don't edit those minutes.**

Q:     I'm not asking you that. Please listen to the question I'm asking you. It's a lot simpler. You are trying to guess at what I'm asking you. My questions are very, very basic.

        If Juan Vieyra tells you the line was operating from 6:00 a.m. to 2:00 p.m. do those employees get paid from 6:00 a.m. to 2:00 p.m. less a half hour, or are they paid from the time they swiped in to the time they swiped out, because there can be a variation between the two?

A:     I'm having a hard time understanding directly what you want me to answer, because I'm trying to state to you it is all in the program, and **no one is altering those minutes.**

Q:     **I'm not asking you about altering anything. That's the point. You are absolutely fixated on this. You have mentioned that three times now. I'm not asking you about altering anything.** In fact, I don't think you alter anything at all. My questions are real basic. I want to know how the computer system operates. I'm trying to figure out the mechanics, what it is you do. I have never seen the paperwork.

(Plfs. Exh.F, Brown I Dep., pp. 27-29) (emphasis added)

26.     In her second deposition, Brown admitted she changed employees' swipe in and swipe out times. (See, e.g., Plfs. Exh. H, Brown II Dep., p. 24, 26-27, 29-30, 31, 34-35)

### THE UNREDACTED PUNCH DETAIL REPORTS SHOW SYSTEMATIC REDUCTION OF EMPLOYEES' TIME

27.     The Employer's later-produced punch detail reports show a series of "Add Punch" and "Remove Punch" entries, corresponding to dates, for the majority of employees. (See, e.g., Plfs. Exh. J, Huebsch Dep. Exh. 1)

28.     These entries mean the Employer removed an employee's actual swipe in or swipe out time, and replaced it with a different time. (Plfs. Exh. H, Brown II Dep., p. 15-17, 19-20, 24-27, 29-30, 31, 34-35) Kronos then calculated the number of hours worked based on the changed times, not the employees' actual swipe in or swipe out time. (Id.)

29.     Plaintiffs employed a law clerk, Jessica Huebsch, from the law firm of Jacobs, Burns, Orlove, Stanton & Hernandez to perform simple mathematical calculations regarding the Employer's later-produced punch detail reports. (Plfs. Exh. I, Huebsch Dep., p.7-8, 11)

30.     Huebsch evaluated the Employer's later-produced punch detail reports and evaluated the discrepancies between the employees' actual swipe in and swipe out times and the changed times with which the Employer replaced the actual times. (Plfs. Exh. I, Huebsch Dep., p. 12)

31.     Huebsch evaluated a representative sampling of the Employer's later-produced punch detail reports, consisting of one month for each year from 1999 to 2002, with the exception of 2001, for which she evaluated a two-month period. (Plfs. Exh. I, Huebsch Dep., p.15)  She chose a month from each season, to reflect any seasonal changes. (Id.)

32.     For each day an employee was recorded as having worked, Huebsch calculated the difference in minutes between each employee's actual swipe in/swipe out time (which she labeled "AT," for "actual swipe-time") and the Employer's manually changed swipe in/swipe out time (which she labeled "CT" for "changed swipe-time"). (See e.g., Plfs. Exh. I, Huebsch Dep., p.19-27)

33.     For example, the punch detail report for the time period of October 28, 2001 to November 3, 2001, shows the swipe in time for Ocario Sanchez, which Kronos used to calculate the number of hours he worked on November 1, 2001, is 5:58 a.m. (Plfs. Exh. I, Huebsch Dep., p.22-23; Plfs. Exh. J, Huebsch Dep. Exh. 1, Bates No. 6319)  The swipe out time Kronos used to calculate the number of hours Sanchez worked is 5:15 p.m. (Id.)  The Employer's Kronos time system automatically subtracted one-half hour for lunch and automatically rounded Sanchez' starting time to 6:00 a.m., thereby calculating the number of hours Sanchez worked that day as 10.75 hours. (Plfs. Exh. I, Huebsch Dep., p.24; Plfs. Exh. J, Huebsch Dep. Exh. 1, Bates No. 6319)

However, the punch detail report shows Sanchez actually swiped out at 5:31 p.m.; his actual swipe out time was removed and replaced with 5:15 p.m. (Plfs. Exh. I, Huebsch Dep., p.24; Plfs. Exh. J, Huebsch Dep. Exh. 1, Bates No. 6319)  Thus, Sanchez was not paid for the 2 minutes when Kronos automatically rounded his starting time and the 16 minutes when the Employer replaced his actual

10

swipe out time of 5:31 p.m. with 5:15 p.m., for a total of 18 minutes. (Plfs. Exh. I, Huebsch Dep., p.24-26; Plfs. Exh. J, Huebsch Dep. Exh. 1, Bates No. 6319)

34.     Based on these calculations, Huebsch devised a chart to record the number of minutes for which an employee was not paid. (Plfs. Exh. K, Bates Nos. PLF 0003-0015, PLF 0049-66, PLF 0111-148, PLF 0248-2710003-0271) Thus, for example, the 18 minutes Sanchez worked for which he was not paid on November 1, 2001, appears as "(18) AT," meaning that, using Sanchez' actual swipe in and swipe out time, he was not paid for 18 minutes. (Plfs. Exh. I, Huebsch Dep., p.24-26, Plfs. Exh. K, Bates No. PLF 0111)

35.     There were also times when Kronos' automatic rounding benefited an employee. (Plfs. Exh. I, Huebsch Dep., p.28-29) When this happened, Huebsch gave the Employer a credit for such time. (Plfs. Exh. I, Huebsch Dep., p.28-31) She recorded such a credit in her charts with a plus (+) sign. (See, e.g., Plfs. Exh. I, Huebsch Dep., p.31; Plfs. Exh. K, Bates No. PLF 0111)

36.     Huebsch consistently recorded in her charts the number of minutes the employees worked for which they were not paid, as well as the number of minutes they did not work for which they were paid. (Plfs. Exh. I, Huebsch Dep., p.31)

37.     Huebsch kept track of whether the minutes for which the employees were not being paid would have been paid at the straight time wage rate, as overtime after 8 hours in a day under the collective bargaining agreement between the parties, or as overtime after 40 hours in a workweek under the Fair Labor Standards Act ("FLSA"). (Plfs. Exh. K, Bates Nos. PLF 0003-0015, PLF 0049-66, PLF 0111-148, PLF 0248-271; Plfs. Exh. L, Bates Nos. PLF 0002, PLF 0048, PLF 0110, PLF 0247)

38.     Huebsch also tracked the number of minutes that were paid as straight time which should have been paid as overtime under the parties' collective bargaining agreement. (Plfs. Exh. K, Bates Nos. PLF 0003-0015, PLF 0049-66, PLF 0111-148, PLF 0248-271; Plfs. Exh. L, Bates Nos. PLF 0002, PLF 0048, PLF 0110, PLF 0247)

11

39.     Huebsch totaled her calculations in another chart marked "Totals." (Plfs. Exh. L, Bates Nos. PLF 0002, PLF 0048, PLF 0110, PLF 0247)

40.     Huebsch's calculations show there is a negative difference of thousands of minutes between the employees' actual swipe in and swipe out times and the Employer's manually changed times. (Plfs. Exh. K, Bates Nos. PLF 0003-0015, PLF 0049-66, PLF 0111-148, PLF 0248-271; Plfs. Exh. L, Bates Nos. PLF 0002, PLF 0048, PLF 0110, PLF 0247)

41.     According to Huebsch's calculations, from June 27, 1999 to July 24, 1999, the employees were not paid for a total of 18,223 minutes they had worked, 2,421 of which should have been paid as straight time and 15,802 of which should have been paid as overtime under the parties' collective bargaining agreement. (Plfs. Exh. L, Bates No. PLF 0002) If these minutes were calculated under the FLSA, 4,862 minutes should have been paid as straight time and 13,361 minutes should have been paid as overtime. In addition, 6,600 minutes were paid as straight time but should have been paid as overtime under the collective bargaining agreement. (Id.)

42.     According to Huebsch's calculations, from April 30, 2000 to May 27, 2000, the employees were not paid for a total of 16,856 minutes they had worked, 7,110 of which should have been paid as straight time and 9,746 of which should have been paid as overtime under the parties' collective bargaining agreement. (Plfs. Exh. L, Bates No. PLF 0048) If these minutes were calculated under the FLSA, 11,133 minutes should have been paid as straight time and 5,723 minutes should have been paid as overtime. In addition, 555 minutes were paid as straight time but should have been paid as overtime under the collective bargaining agreement. (Id.)

43.     According to Huebsch's calculations, from October 28, 2001 to December 22, 2001, the employees were not paid for a total of 33,609 minutes they had worked, 15,981 of which should have been paid as straight time and 17,628 of which should have been paid as overtime under the parties' collective bargaining agreement. (Plfs. Exh. L, Bates No. PLF 0110) If these minutes were calculated under the FLSA, 21,067 minutes should have been paid as straight time and 12,542 minutes should have been paid as overtime. In addition, 930 minutes were paid as

12

straight time but should have been paid as overtime under the collective bargaining agreement. (Id.)

44.     According to Huebsch's calculations, from January 27, 2002 to February 23, 2002, the employees were not paid for a total of 24,170 minutes they had worked, 18,861 of which should have been paid as straight time and 5,309 of which should have been paid as overtime under the parties' collective bargaining agreement. (Plfs. Exh. L, Bates No. PLF 0247)  If these minutes were calculated under the FLSA, 23,334 minutes should have been paid as straight time and 836 minutes should have been paid as overtime.  In addition, 60 minutes were paid as straight time but should have been paid as overtime under the collective bargaining agreement.  (Id.)

45.     During litigation in this matter, the Employer asserted that the Kronos system rounds in 7-minute increments.  For example, if an employee swipes in at 6:07 a.m., the employee's time is rounded to 6:00 a.m. and the employee is paid from 6:00 a.m.  If the employee swipes in at 6:08 a.m., the employee's time is rounded to 6:15 a.m and the employee does not get paid until 6:15 a.m.  (Plfs. Exh. A, LaValle, Jr. Dep., p.18-19)  The Employer asserted during litigation that such rounding occurs with respect to both the employee's swipe in time and the employee's swipe out time.  (Id. p.22)

46.     During litigation in this matter, the Employer asserted that laborers are paid on an hourly basis, calculated using their swipe in and swipe out times.  (Plfs. Exh. A, LaValle, Jr. Dep., p.21)

47.     During her second deposition, Brown stated the laborers' time was  subject to "exceptions," meaning their swipe in and/or swipe out times were changed.   (Plfs. Exh. H, Brown II Dep., p.20, 26-27, 34-35, 73)

48.     Specifically, Brown testified as follows:

Q:     If a laborer is scheduled to end at 3:00 p.m. and he swipes out at 3:11, is he paid 'till 3:15?
A:     (No verbal response.)
Q:     Or would that be an entry that would be subject to an exception by the supervisor?

A:    That would be an entry that would be subject to an exception when the supervisor reviewed the exception report.

(Plfs. Exh. H, Brown II Dep., p.73)

49.    The Employer prevented boners, trimmers and laborers from benefiting from Kronos' automatic rounding by manually changing employees' time. (Plfs. Exh. H, Brown II Dep., p.20, 26-27, 34-35, 73; Plfs. Exh. J, Huebsch Dep. Exh. 1)

## DONNING AND DOFFING FOR THE BUTCHERS

50.    Employees who use knives and wear safety equipment on the production line are called pace boners and trimmers (they have also been referred to as butchers). (Plfs. Exh. A, LaValle Jr., Dep. p.74) Boners cut meat with a bone in; trimmers cut meat without a bone. (Plfs. Exh. E, Velasquez Dep., p.13)

51.    It is undisputed the boners and trimmers do not get paid for the amount of time it takes them to put on their equipment at the beginning of the day, or to take the equipment off and clean it at the end of the day. (Plfs. Exh. M, Def.'s Resp. to Plf.'s First Set of Interrog., p.6; Plfs. Exh. N, Llames Dep., p.8, 27, 34; Plfs. Exh. O, Flores Dep., p.11-12)

52.    The employees are required to wear the plastic gloves because they cannot have direct contact with the meat. (Plfs. Exh. P, Gonzalez Dep., p.26; Plfs. Exh. N, Llames Dep., p.12) They are also required to wear the plastic sleeves for the same reason. (Plfs. Exh. P, Gonzalez Dep., p.29)

53.    The employees wear the cloth gloves because it is cold in the plant. (Plfs. Exh. C, Vieyra Dep., p.16; Plfs. Exh. D, Venegas Dep., p.32; Plfs. Exh. P, Gonzalez Dep., p.22, 32-33)

54.    Some employees wear a cloth and/or plastic glove over the steel mesh glove because otherwise, the steel glove is very loose and the employee cannot grip the knife as well, causing the knife to slip and become dull more quickly. (Plfs. Exh. P, Gonzalez Dep., p.27-28)

55.    In the morning, the boners and trimmers are expected to have their safety equipment on by the time they swipe in. (Plfs. Exh. C, Vieyra Dep., p.34)

14

56.     Boners and trimmers are required to clean their equipment at the end of each day. (Plfs. Exh. B, Mizaur Dep. p.57)

57.     There are approximately twelve spots in the plant where the boners and trimmers can clean their equipment. (Plfs. Exh. E, Velasquez Dep., p.69) The Company has provided three sinks for the employees to use in cleaning their equipment. (Id. p.69) Only one employee at a time can use a sink. (Id. p.70) The Company has also provided hoses for the employees to use to clean their equipment. (Id. p.69) However, the employees do not like using the hoses because the water is hot and pressurized, and splashes on themselves and other employees. (Id. p.75; Plfs. Exh. P, Gonzalez Dep., p.21) Sometimes there are lines at the sinks and the hoses to use them. (Plfs. Exh. E, Velasquez Dep., p.69)

58.     The laborers, boners and trimmers go to lunch at the same time. (Plfs. Exh. B, Mizaur Dep., p.57) The boners and trimmers take their safety equipment off before entering the lunchroom; only items worn underneath their frock (i.e., their street clothes and belly guard), can be worn into the lunchroom. (Plfs. Exh. B, Mizaur Dep., p.58; Plfs. Exh. P, Gonzalez Dep., p.39; Plfs. Exh. N, Llames Dep. p.15-17; Plfs. Exh. O, Flores Dep., p.16)

59.     Employees get one-half hour for lunch. (Plfs. Exh. C, Vieyra Dep., p.55) Although the employees do not swipe in or out for lunch, the lunch period is unpaid because Kronos automatically subtracts one-half hour each day from the number of hours worked. (Plfs. Exh. F, Brown Dep. I, p.20-21; Plfs. Exh. C, Vieyra Dep., p.55; Plfs. Exh. D, Venegas Dep., p.49-50)

60.     After lunch, employees are expected to be in their positions with all their equipment on when the line starts. (Plfs. Exh. D, Venegas Dep., p. 50; Plfs. Exh. E, Velasquez Dep., p.63; Plfs. Exh. N, Llames Dep., p.17)

61.     If an employee is not in his gear when the line starts, he can be disciplined. (Plfs. Exh. E, Velasquez Dep., p. 64)

62.     Rafael Cruz is a butcher. (Plfs. Exh. Q, Cruz Dep., p.6)

15

63.     Rafael Cruz estimates it takes him 7-8 minutes each morning to put on his safety equipment. (Plfs. Exh. Q, Cruz Dep., p.16)  It takes him 6-7 minutes at the end of each day to remove his equipment and wash his knives. (Id. p.18-19)

64.     Juan Gonzalez is a boner. (Plfs. Exh. P, Gonzalez Dep., p.7)

65.     Juan Gonzalez estimates it takes him 10-15 minutes to put on his equipment each morning. (Plfs. Exh. P, Gonzalez Dep., p.30)

66.     Maria Llames is a trimmer. (Plfs. Exh. N, Llames Dep., p.6)

67.     Maria Llames estimates it takes her 5-7 minutes to put on her safety equipment each morning before she swipes in, and another 5-7 minutes at the end of the day to take her equipment off and clean it. (Plfs. Exh. N, Llames Dep., p.13, 25)

68.     Felipe Flores is a trimmer and a boner. (Plfs. Exh. O, Flores Dep., p.6-7)

69.     Felipe Flores estimates it takes him 4-5 minutes to put his equipment on in the morning, and 5-6 minutes to remove his equipment and wash it at the end of each day. (Plfs. Exh. O, Flores Dep., p.25)

## KNIFE SHARPENING

70.     The Company contracts with a knife-sharpening company to visit the plant once a week and replace the knives of the boners and trimmers with newly sharpened knives. (Plfs. Exh. E, Velasquez Dep., p.80-81)

71.     Between the weekly visits from the knife sharpening service, employees are responsible for sharpening their knives. (Plfs. Exh. E, Velasquez Dep., p.82-83; Plfs. Exh. N, Llames Dep., p.21)

72.     The employees sharpen their knives with a whetstone every day (Plfs. Exh. E, Velasquez Dep., p.84; Plfs. Exh. Q, Cruz Dep., p.11-12; Plfs. Exh. O, Flores Dep., p.27), or every other day. (Plfs. Exh. N, Llames Dep., p.35-38)

16

73.    Boners and trimmers use a whetstone to sharpen their knives because they need sharp knives to cut through the meat; they do not sharpen their knives out of habit. (Plfs. Exh. N, Llames Dep., p.38)

74.    The employees use the whetstone to sharpen their knives before or after their shift starts and are not paid for this.   (Plfs. Exh. E, Velasquez Dep., p.84-85, 101; Plfs. Exh. P, Gonzalez Dep., p.24)

75.    It takes Rafael Cruz approximately five minutes every day to sharpen his knives with the whetstone. (Plfs. Exh. Q, Cruz Dep., p.12)

76.    It takes Maria Llames approximately five minutes to sharpen her three knives; she knows how long it takes because she has timed it, using a clock. (Plfs. Exh. N, Llames Dep., p.37)

77.    Felipe Flores sharpens his knives at the end of each day, after his shift is over. (Plfs. Exh. O, Flores Dep., p.27)  It takes him approximately five minutes to sharpen his knives.  (Id. p.31)

Respectfully submitted,

One of Plaintiffs' Attorneys

Dated:  July 22, 2003

Beth A. Clukey
Jacobs, Burns, Orlove, Stanton
        & Hernandez
122 S. Michigan Ave., Suite 1720
Chicago, IL  60603

17

# SEE CASE FILE FOR EXHIBITS