# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8062 | **DATE** | 12/19/2003 |
| **CASE TITLE** | Juan T. Gonzalez, et al. vs. Farmington Foods, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.   Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter memorandum opinion and order. Defendant's motion for summary judgment is granted as to plaintiffs' state law claims and denied as to plaintiffs' FLSA claims. Status will be set by a separate minute order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | 2 |
| | No notices required. | | number of notices |
| ✓ | Notices mailed by judge's staff. | | DEC 22 2003 |
| | Notified counsel by telephone. | | date docketed |
| | Docketing to mail notices. | | docketing deputy initials |
| | Mail AO 450 form. | | 12/19/2003 |
| | Copy to judge/magistrate judge. | | date mailed notice |

Document Number

70

courtroom deputy's initials

CLERK, U.S. DISTRICT COURT

03 DEC 19 AM 4:28

Date/time received in central Clerk's Office   mailing deputy initials

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| JUAN T. GONZALEZ, SERGIO GONZALES, MARIA L. LLAMES, LINO RUBIO, RAFAEL CRUZ, NICOLAS PEDRO, FELIPE FLORES, and all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 00 C 8062 |
| v. | ) ) | Magistrate Judge Ian H. Levin |
| FARMINGTON FOODS, INC. | ) ) | |
| Defendant. | ) ) ) ) | |

DUCKETED
DEC 2 2 2003

## MEMORANDUM OPINION AND ORDER

Plaintiffs Juan T. Gonzalez, Sergio Gonzales, Maria L. Llames, Lino Rubio, Rafael Cruz,

Nicolas Pedro, Felipe Flores, and all others similarly situated (hereinafter "Plaintiffs") seek recovery

in an Amended Complaint alleging violations of the Fair Labor Standards Act (hereinafter "FLSA"),

29 U.S.C. § 201 *et seq.*, the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* and the Illinois

Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* Pending before the Court is Defendant

Farmington Foods, Inc.'s (hereinafter "Defendant") motion for summary judgment in the cause. For

the reasons hereinafter set forth, Defendant's motion is granted as to its state law claims and denied

as to the FLSA claims.

## INTRODUCTION

Defendant owns and operates a meat processing plant located in Forest Park, Illinois.[1]

---

[1]Defendant is an employer within the meaning of the FLSA. 29 U.S.C. § 203(d).
Defendant's business activities constitute an enterprise engaged in commerce or in the

70

(Def.'s Am. LR56.1(a)(3) St. ¶ 1.) Defendant's business entails primarily de-boning, trimming and packaging pork loins for resale to hotels, restaurants, and grocery stores; however, it also processes a variety of beef and chicken products. (Def.'s Am. LR56.1(a)(3) St. ¶ 1; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 7.) Defendant employs between 130 and 140 employees comprised of approximately forty-five to forty-six pace boners and pace trimmers (individuals who debone, cut and trim meat)[2] and the balance of the employees are laborers (individuals who *inter alia* weigh, package, and ship pork products). (Def.'s Am. LR56.1(a)(3) St. ¶¶ 12, 13, 15; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 8.) Defendant's plant has one shift and generally runs five days per week and occasionally on Saturdays. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 6.) Mr. Juan Velasquez supervises the pace boners and pace trimmers and Mr. Ismael Venegas supervises the laborers. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 4, 5.) The production line typically starts each morning when a bell is rung at 6:00 a.m. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 9.)

Plaintiffs, in this case, are current and former employees of Defendant who are or have been represented by the United Food and Commercial Workers Union, Local 546100-A (formerly Local 100-A through July 2001) (hereinafter the "union"). (Def.'s Am. LR56.1(a)(3) St. ¶ 2.) The union has been the collective bargaining agent for Defendant's production workers (as is pertinent herein, pace boners, pace trimmers and laborers) for approximately twelve to fifteen years and has entered

---

production of goods for commerce as defined in 29 U.S.C. § 203(s)(1).

[2]Prior to 1999, pace boners and pace trimmers were called butchers. (LaValle Dep. at 73-74.)

The group of employees consisting of pace boners and pace trimmers was conditionally certified as the "Safety Equipment Class" by the Court on August 8, 2001. (Def.'s LR56.1(a)(3) St. ¶ 14.)

into successive collective bargaining agreements. (*Id.* ¶ 3.) The two most recent collective bargaining agreements cover the periods November 1, 1997 through October 31, 2000 and November 1, 2000 through October 31, 2004, respectively. (*Id.* ¶¶ 3, 4; Def.'s Ex. 8, p. 18.) Mr. Javier Ramirez, the Director of Organizing for Local 546100-A, was the chief negotiator for the union for the most recent collective bargaining agreement (i.e., November 1, 2000 through October 31, 2004). (*Id.* ¶ 5.)

At issue in the case are the two most recent collective bargaining agreements. Specifically, Plaintiffs allege, in violation of the collective bargaining agreements, Defendant failed to pay them their regular rate of pay for hours they worked up to forty hours per week and for hours they worked in excess of forty hours per week (i.e., overtime on a weekly basis) as required by the FLSA for the following: (1) donning and doffing necessary and required sanitary and safety equipment; (2) donning and doffing required sanitary and safety equipment during meal breaks (as well as other compensable activities during meal breaks); (3) meal breaks; (4) cleaning equipment (on a daily and weekly basis); (5) sharpening knives; and (6) time spent before and after line operations. (Am. Complt. ¶ 6.) 29 U.S.C. §§ 206; 207. Plaintiffs further assert state law claims in violation of the Illinois Minimum Wage Law and the Illinois Wage Payment and Collection Act on these same stated bases. (Am. Complt. ¶ 12 (Supplementary Count I & II)). 820 ILCS 105/4; 820 ILCS 115/3, 115/4.

Plaintiffs further complain that Defendant violated the FLSA by failing to make, keep and preserve adequate and accurate records of the wages, hours and other conditions of employment maintained by Defendant (i.e., Defendant's records failed to show adequately and accurately, *inter alia*, the number of hours worked each workday and the total number hours worked each workweek with respect to its employees). (*Id.* ¶ 7.) 29 U.S.C. §§ 211(c); 215(a)(7).

## DISPUTED BACKGROUND FACTS

3

### *Donning and Doffing Sanitary and Safety Equipment, and Equipment Cleaning*

In general, while disputed, the facts in the case involve the pace boners and pace trimmers donning certain sanitary and safety equipment before taking their places on the production line (i.e., pace line) and doffing the same sanitary and safety equipment after the completion of a shift.[3] While some of the sanitary and safety equipment is required, some of the pace boners and pace trimmers wear additional items for their convenience and to assist in their job performance. The sanitary and safety equipment varies according to particular positions and job assignments. Generally, a pork boner or pork trimmer utilizes the following sanitary and safety equipment: a helmet, a frock (white smock), a plastic apron, an arm guard, a belly guard, a plastic arm sleeve, a variety of gloves (i.e., cotton,[4] plastic[5] and steel mesh), a hook, a knife holder, a chida (a piece of steel used to straighten the edge of a knife blade) and knives. (Def.'s Am. LR56.1(a)(3) St. ¶ 38; Pls.' Resp. to Def.'s Am. LR56.1(a)(3) St. ¶ 38; Gonzalez Dep. at 24-26, 28.)  At the end of the day, the pace boners and pace trimmers are required to clean their equipment. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 56.)

The pace boners and pace trimmers typically don and doff their sanitary and safety equipment several times during the day (i.e., during breaks and lunch periods). Thus, in addition, to donning and doffing sanitary and safety equipment before and after shifts, the pace boners and pace trimmers

---

[3]Plaintiffs are not asserting a donning and doffing of sanitary and equipment claim on behalf of the laborers. (Pls.' Mem. at 5.)

[4]Employees are not required to wear cotton gloves; however, they purchase them through Defendant. (Venegas Dep. at 47; Gonzalez Dep. at 27-28.)  Many employees wear cotton gloves because it is cold in the plant and so that they can grip their knives better. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 53, 54.)

[5]The employees who have direct contact with the meat are required to wear plastic gloves and plastic sleeves. (Gonzalez Dep. at 27, 29.)

take their safety equipment off before entering the lunchroom; however, they can wear their street clothes and belly guards under their frocks in the lunchroom.[6] (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 58.) After lunch, the pace boners and pace trimmers are expected to be in their positions on the production line with all of their sanitary and safety equipment on when the pace line begins to operate. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 60.) If an employee does not have his equipment on when the line starts, he can be disciplined. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 61.)

The amount of time it takes the pace boners and pace trimmers to don and doff their sanitary and safety equipment before and after shifts and during meal periods (and clean their equipment) is disputed in the case.[7] For example, Plaintiffs' expert, Jerry Ingalls, conducted two time studies (i.e., one that was three days in length and another that was two days in length) using a stop watch to determine how much time it took the pace boners and pace trimmers to don and doff sanitary and safety equipment and clean equipment each day. (Def.'s Am. LR56.1(a)(3) St. ¶ 45; Def.'s Ex. 16, Time Study of Employees of Farmington Food, Inc., Forest Park, Illinois.) Mr. Ingalls concluded that it took the pace boners and pace trimmers 14.6 minutes per day to perform their donning,

---

[6]The pace boners and pace trimmers and laborers, who eat lunch together, are given a half hour non-compensated lunch pursuant to the terms of the collective bargaining agreements. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 59; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 59.)

[7]Rafael Cruz (a pace boner) estimates that it takes him seven to eight minutes to put his safety equipment on each morning and six to seven minutes to remove his equipment and wash his knives at the end of the day. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 62, 63.) Juan Gonzalez (a pace boner) estimates that it takes him ten to fifteen minutes to put his equipment on each morning. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 64, 65.) Maria Llames (a pace trimmer) estimates that it takes her five to seven minutes to put on her safety equipment on each morning and five to seven minutes to take off her equipment and clean it at the end of the day. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 66, 67.) Felipe Flores (a pace boner) estimates that it takes him four to five minutes to put his equipment on each morning and five to six minutes to remove his equipment and wash it at the end of the day. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 68, 69.)

doffing and equipment cleaning activities; however, if walking time was excluded, it would take these employees 12.6 minutes to perform these activities. (*Id.*) Defendant's expert, Albert Swarts, also conducted a time study using MODAPTS (a predetermined time system)[8] and found that Plaintiffs' donning, doffing and equipment cleaning activities took 5.921 minutes to perform each day. (Def.'s Am. LR56.1(a)(3) St. ¶ 46; Def.'s Ex. 17, Swarts Engineering report.)

There is, however, no dispute between the parties that the pace boners and pace trimmers are not compensated for the time it takes them to don and doff their sanitary and safety equipment. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 51; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 51.) Moreover, there is no dispute over the fact that the pace boners and pace trimmers do not get paid for the amount of time it takes them to clean their equipment. (*Id.*)

### Knife Sharpening

The pace boners and pace trimmers (and several laborers) utilize sharp knives in their work.[9] Because the pace boners and pace trimmers need sharp knives to perform their jobs properly, Defendant contracts with a knife-sharpening company to visit the plant once a week and replaces the knives of the pace boners and pace trimmers with newly sharpened knives.[10] (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 70.) In between these weekly visits, the pace boners and pace trimmers

---

[8]MODAPTS is derived from "MODular Arrangement of Predetermined Time Standards." http://www.modapts.org/faqs.htm.

[9]Pace boners cut meat with a bone in it and pace trimmers cut meat without a bone in it. (Pls.' Ex. E, Velasquez Dep. at 13.)

[10]Section 12 of the 1997-2000 Collective Bargaining Agreement states that "The Employer in all cases will have the tools used by employees sharpened and ground at the Employer's expense." (Def.'s Ex. 8.) Moreover, similar language is found in Section 17 of the current collective bargaining agreement. (*Id.*)

typically sharpen their knives either while working on the production line (i.e. pace line) and/or before or after each shift by using a whetstone and/or childa (straightens the edge of a knife blade so it will cut smoother). (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 71, 74, 77; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 71, 74; Velasquez Dep. at 82-85.)

With regard to knife sharpening, the parties dispute whether the pace boners and pace trimmers are responsible for or required to sharpen their knives between visits from the knife-sharpening company.[11] (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 71-73.) However, while there is no dispute regarding the fact that the pace boners and pace trimmers are not compensated for the time they spend sharpening knives (before and after their shifts); they are compensated for the time spent sharpening their knives while working on the production line (i.e., pace line).[12] (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 74; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 74; Velasquez Dep. at 84-85; Mizaur Dep. 68-69.)

### *Union Negotiations*

The parties dispute whether they bargained over the issue of payment for preparatory and concluding work (i.e., donning and doffing sanitary and safety equipment, equipment cleaning and knife sharpening) activities during contract negotiations for their current collective bargaining agreement. Plaintiffs contend that the union raised the issue as a housekeeping issue because employees were not being paid for preparatory and concluding activities and asked Defendant to pay

---

[11]For instance, Velasquez (pork boners and pork trimmers supervisor) testified that he keeps ten sharp knives in his locker for those individuals who need a sharp knife between visits by the knife-sharpening company. (Velasquez Dep. at 84.)

[12]Rafael Cruz, Maria Llames and Felipe Flores testified that it takes each of them approximately five minutes to sharpen their knives either before or after a shift. (Cruz Dep. at 12; Llames Dep. at 37; Flores Dep. at 31.)

for such activities; however, the union did not make a demand with respect to this issue. (Def.'s Am. LR56.1(a)(3) St. ¶¶ 6, 7; Pls.' Resp. to Def.'s Am. LR56.1(a)(3) St. ¶ ¶ 6, 7).   Defendant subsequently made a proposal[13] to pay for preparatory and concluding activities, but the union refused to negotiate over the proposal. (Def.'s Am. LR56.1(a)(3) St. ¶¶ 8, 9.)  Because the union refused to negotiate over Defendant's proposal, Defendant filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"). (Def.'s Am. LR56.1(a)(3) St. ¶ 9.) The NLRB dismissed the charge finding that there was insufficient evidence to show that the union refused to bargain; however, the NLRB indicated that preparatory and concluding activities were a mandatory subject of bargaining. (Def.'s Am. LR56.1(a)(3) St. ¶ 10.) Thus, no agreement between the parties was reached with respect to the payment of preparatory and concluding activities.  (Def.'s Am. LR56.1(a)(3) St. ¶ 11.)

***Hourly Rate/Gang Time***

Prior to June of 1999, Defendant paid its butchers (title subsequently changed to pork boners and pork trimmers) either piece rate (based on the number of pieces of meat cut during a certain period of time) or on an hourly basis. (Def.'s Am. LR56.1(a)(3) St. ¶ 26.) After June of 1999, Defendant began paying its butchers (title subsequently changed to pork boners and pork trimmers)

---

[13]Defendant's proposal to pay for preparatory and concluding activities was submitted to the union on September 25, 2000 as its Proposal Number 14.  This proposal stated as follows: "The parties acknowledge and agree that determining the reasonable amount of time employees spend in preparatory and concluding activities is very difficult. The parties also agree that some of these preparatory and concluding activities may or may not be considered hours worked under the Fair Labor Standards Act (FLSA). Therefore, as a compromise agreement, the parties hereby agree that the Employer shall pay six (6) minutes per day to each employee who works each scheduled workday, excluding holidays and vacations, for all preparatory and concluding activities which may include but is not limited to clothes changing time, donning and doffing safety equipment, washing safety equipment, knife sharpening and cleaning, and time going to and from the knife and laundry rooms." (Def.'s Am. LR56.1(a)(3) St. ¶ 8.)

on an hourly basis. (*Id.*) Defendant, thus, avers that pace boners and pace trimmers are paid by the hour and their hours are calculated based upon "gang time" (i.e., on the time the line is operating). (Def.'s Resp. to Pls.' Am. LR56.1(a)(3) St. ¶ 78.) Defendant also pays its laborers on an hourly basis. (Def.'s Am. LR56.1(a)(3) St. ¶ 19; LaValle Dep. at 14.)

Plaintiffs, however, contend that there is a conflict in the record regarding whether pace boners and pace trimmers are paid on an hourly or "gang time" basis. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 78.) For instance, Defendant's Director of Finance, Albert LaValle, testified that the pace boners and pace trimmers are paid based on "gang time" whereas Defendant's Production Manager, Ron Mizaur, testified that they are paid on an hourly basis. (*Id.*) The parties, therefore, dispute whether the pace boners and pace trimmers are paid based on an hourly rate or gang time. (Def.'s Am. LR56.1(a)(3) St. ¶ 21; Pls.' Resp. to Def.'s Am. LR56.1(a)(3) St. ¶ 21; Pls.' Am. LR56.1(b)(3)(B) St. ¶ 78.)

### *Kronos System*

Defendant utilizes a computer system known as Kronos to electronically record employees' time. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 10; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 10.) Employees use a company issued Kronos card to swipe in and out of on a Kronos time clock that is part of the Kronos computerized system. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 11; Def's Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 11.) The Kronos system records, to the minute, when an employee swipes in or swipes out. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 12.) The Kronos system does not allow an employee to swipe in more than seven minutes prior to his scheduled start time. (Def.'s Am. LR56.1(a)(3) St. ¶ 28.) Moreover, the Kronos system rounds an employee's time to the nearest

quarter hour.[14]  (*Id.* ¶ 27; Pls.' Am. LR56.1(b)(3)(B) St. ¶ 24.)

The Kronos system allows Defendant to generate reports referred to as the "punch detail report," "exception report with punch detail" and "daily coverage report." (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 13; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 13; Def.'s Am. LR56.1(a)(3) St. ¶ 34; Pls.' Resp. to Def.'s Am. LR56.1(a)(3) St. ¶ 34.)  The weekly punch detail report shows an employee's swipe in and swipe out times and the number of hours and minutes for which an employee was paid. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 14; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 14.) The weekly punch detail report is generated by Defendant and is printed out on Monday for the previous week and is used to generate payroll checks. (Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 13.)

The exception report with punch detail is the first report that is printed out for the prior day which shows an employee's swipe in and swipe out times. (Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 15.) The data contained in the exception report with punch detail is preliminary until it has been reviewed and approved by a supervisor and/or manager and Defendant's Payroll Manager, Donna Brown, has reviewed and processed any changes (denoted as "add punch" or "remove punch") that were noted on the report.  (*Id.*; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B)

---

[14]If an employee who is scheduled to start work at 6:00 a.m., but actually swipes in at 5:53, 5:54: 5:55, 5:56, 5:57, 5:58, or 5:59 a.m. would have his time rounded to 6:00 a.m. (Def.'s Am. LR56.1(a)(3) St. ¶ 30.) Moreover, an employee who swipes in at 6:08 a.m. or after would have his time rounded to 6:15 a.m. (*Id.* ¶ 31.)

Another example of rounding is if an employees swipes in at 5:53 a.m. and swipes out at 3:07 p.m., his paid time would be from 6:00 a.m. to 3:00 p.m. (based on a line time scheduled to start at 6:00 a.m. and end at 3:00 p.m.). (Def.'s Am. LR56.1(a)(3) St. ¶ 32.) Further, if an employee swipes in at 6:07 a.m. and swipes out at 2:53 p.m., he is paid from 6:00 a.m. to 3:00 p.m. (*Id.* ¶ 33.) Thus, the rounding times are considered separately and applied to the swipe in and swipe out times. (*Id.* ¶ 32.)

St. ¶ 26.) The edits to the exception report with punch detail reflect changes made by a supervisor and/or manager for a variety of reasons which may include an employee failing to swipe in or swipe out; a pace boner or pace trimmer swiping in or swiping out more than seven minutes before or after his shift; an employee swiping in, but not being ready to work; or an employee swiping in or swiping out multiple times due to the employee forgetting whether he, in fact, had swiped in or swiped out. (*Id.*) In other words, a supervisor and/or manager will change an employee's swipe in or swipe out time when it is deemed that the employee's swipe in and/or swipe out time is inappropriate. (*Id.*) Moreover, the exception report with punch detail is only saved for a short period of time and then it is discarded. (Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 17.)

The "daily coverage report" is printed out every day to show the various start times of employees and also forecasts times during which the pace line is expected to operate. (Def.'s Am. LR56.1(a)(3) St. ¶ 34; Pls.' Resp. to Def.'s Am. LR56.1(a)(3) St. ¶ 34.) The daily coverage report indicates when employees are scheduled to start and stop work each day. (Pls.' Resp. to Def.'s Am. LR56.1(a)(3) St. ¶ 34.) Ms. Brown typically prints out the daily coverage report each day. (*Id.*)

During Albert LaValle's deposition, Defendant produced an exception report with punch detail dated October 31, 2001 that listed some of Defendant's employees, including, for example, Antonio Mendoza (laborer). (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 17; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 17; Pls.' Ex. G.) The exception report with punch detail showed Mr. Mendoza's swipe in and swipe out times for October 31, 2001 and listed his name, employee number, department number, total time (including regular and overtime) and meal allowance. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 18; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 18; Pls.' Ex. G.) The punch detail reports that Defendant later produced with respect to Mr. Mendoza, however, showed

11

*inter alia* his recorded start time for October 31, 2001 had been edited from 5:06 a.m. to 5:15 a.m. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 18, 19; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 18, 19.) Thus, the punch exception detail report shows that Mr. Mendoza worked 12.5 hours on October 31, 2001 whereas the punch detail report which was later edited by Defendant (because Mr. Mendoza had swiped in late when he was scheduled to work at 5:00 a.m.) indicates that Mr. Mendoza worked 12.25 hours. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 20, 21; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 20, 21.) Moreover, the punch detail report showed a sequence of "Add Punch" and "Remove Punch" entries below Mr. Mendoza's name indicating other changes in some of his start and ending times. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 19; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 19.)

In addition, similar "Add Punch" and "Remove Punch" entries appear for the majority of employees whose punch detail reports were produced during discovery. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 22.) Thus, these entries mean that Defendant edited an employee's swipe in and swipe out times, replaced them with a different time and then the Kronos system calculated the number of hours worked based on the changed times. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 28; Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 28.)

Plaintiffs employed a law clerk, Jessica Huebsch, to perform simple mathematical calculations regarding Defendant's punch detail reports. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 29.) Ms. Huebsch evaluated a sample of Defendant's punch detail reports consisting of one month for each year from 1999 to 2002, with the exception of 2001 for which she evaluated a two-month period. (*Id.* ¶ 31.) In her evaluation, Ms. Huebsch calculated the difference in minutes between each employee's actual swipe in and swipe out times and Defendant's manually changed swipe in and

swipe out times.[15] (*Id.* ¶ 32.) For example, the punch detail report for Ocario Sanchez for November 1, 2001 shows he swiped in at 5:58 a.m. and swiped out at 5:15 p.m. (*Id.* ¶ 33.) The Kronos system then calculated the number of hours Mr. Sanchez worked that day as 10.75 hours (after a one-half hour lunch period was subtracted). (*Id.*) The punch exception detail report, however, indicated that Mr. Sanchez had actually swiped out at 5:31 p.m., but his actual swipe time was removed and replaced with 5:15 p.m. (*Id.*)

Ms. Huebsch devised a chart where she recorded the number of minutes employees worked, but for which they were not compensated and the number of minutes employees did not work, but for which they were compensated.[16] (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 34-36.) She tracked whether the minutes employees were not being paid constituted straight time, overtime after eight hours worked in a day, and overtime after forty hours in a workweek. (*Id.* ¶ 37.) Ms. Huebsch further tracked the number of minutes that were paid as straight time that should have been paid as overtime under the parties' collective bargaining agreements. (*Id.* ¶ 38.) As a result of Ms. Huebsch's calculations, there was a negative difference of thousands of minutes between the employees' actual swipe in and swipe out times and Defendant's manually changed times. (*Id.* ¶ 40.) Thus, according to Ms. Heubsch's calculations, in 1999 (one month evaluated), employees were not paid for 18,223 minutes, in 2000 (one month evaluated), employees were not paid for 16,856 minutes, in 2001 (two

---

[15]Defendant states, however, that Ms. Heubsch always chose the earliest swipe in time and latest swipe out time even when there were multiple swipe in and swipe out times. (Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 32.) For instance, if an employee was paid from 6:00 a.m. (swiping in at 5:58 a.m.), Ms. Heubsch found a discrepancy of negative two minutes which means that Plaintiffs' claim would include these two minutes. (*Id.*)

[16]Ms. Heubsch recorded those times when the Kronos system's automatic rounding benefitted an employee. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 35.)

months evaluated), employees were not paid for 33,609 minutes, and in 2002 (one month evaluated), employees were not paid for 24,170 minutes for a total of 92,858 minutes.[17] (*Id.* ¶¶ 41-44.)

Defendant's Director of Finance, Mr. Albert LaValle, who is also a certified public accountant examined Ms. Huebsch's calculations and provided the following analysis:

1.  Approximately 43% of Plaintiffs' total claim relate to minutes prior to the start of the shift (i.e., a.m. rounding).
2.  With respect to the laborers only, the minutes prior to the start of a shift is approximately 56% of Plaintiffs' claim (i.e., a.m. rounding).

---

[17]Plaintiffs further allege that:

(A)  18,223 minutes (in 1999) consists of 2,421 minutes which should have been paid as straight time and 15,802 minutes which should have been paid as overtime under the parties' collective bargaining agreement(s). (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 41.) If these minutes were calculated under the FLSA, 4,862 minutes should have been paid as straight time and 13,361 minutes should have been paid as overtime. (*Id.*) Moreover, 6,600 minutes were paid as straight time, but should have been paid as overtime under the collective bargaining agreements. (*Id.*)

(B)  16,856 (in 2000) consists of 7,110 minutes which should have been paid as straight time and 9,476 minutes which should have been paid as overtime under the parties' collective agreement(s). (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 42.) If these minutes were calculated under the FLSA, 11,133 minutes should have been paid as straight time and 5,723 minutes should have been paid as overtime. (*Id.*) Moreover, 555 minutes were paid as straight time, but should have been paid as overtime under the collective bargaining agreements. (*Id.*)

(C)  33,609 minutes (in 2001) consists of 15,981 minutes which should have been paid as straight time and 17,628 minutes which should have been paid as overtime under the parties' collective bargaining agreement(s). (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 43.) If these minutes were calculated under the FLSA, 21,067 minutes should have been paid as straight time and 12,542 minutes should have been paid as overtime. (*Id.*) Moreover, 930 minutes were paid as straight time, but should have been paid as overtime under the collective bargaining agreements. (*Id.*)

(D)  24,170 minutes (in 2002) consists of 18,861 minutes which should have been paid as straight time and 5,309 minutes which should have been paid as overtime under the parties' collective bargaining agreement(s). (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 44.) If these minutes were calculated under the FLSA, 23,334 minutes should have been paid as straight time and 836 minutes should have been paid as overtime. (*Id.*) Moreover, 60 minutes were paid as straight time, but should have been paid as overtime under the collective bargaining agreements. (*Id.*)

3.   The minutes prior to the start of a shift are approximately 32% of the pace boners and pace trimmers claim (i.e., a.m. rounding).

4.   The <u>edited time</u> (the time that is actually changed by the payroll manager) represents approximately 0.24% of the minutes paid to the laborer department and 1.67% of the minutes paid to the pace line department.

5.   Assuming a 480-minute workday (eight hours times 60 minutes) the actual <u>edited times</u> made by Defendant represents 1.15 minutes per day for an employee in the laborer department, and 8.02 minutes per day for an employee in the pace boning department.  (Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 40.)

Defendant, therefore, states that Plaintiffs' allegations that they have not been paid for thousands of

minutes have no merit in light of the permissible rounding and edited times.  (Def.'s Reply at 10.)

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d

265 (1986). Once the moving party has produced evidence to show that it is entitled to summary

judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine

issue of material fact remains for trial. *LINC v. Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir.

1997).

In deciding a motion for summary judgment, a court must "review the record in the light most

favorable to the nonmoving party and . . . draw all reasonable inferences in that party's favor."

*Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the

nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there

is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Linc*, 129 F.3d at 920. A genuine issue

15

of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505, 91 L.Ed.2d 202, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202. Therefore, if the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348, 89 L.Ed.2d 569 (*quoting First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## ISSUE(S)

Defendant brings the subject motion averring that summary judgment is appropriate herein because (1) Plaintiffs' FLSA claims are barred by virtue of Defendant's labor union agreement and the custom and practices established through collective bargaining; and (2) Plaintiffs' state law claims are preempted by Section 301 of the Labor Management Relations Act (hereinafter "LMRA"). (Def.'s Mem. at 2.) 29 U.S.C. § 185(a). Alternatively, Defendant asserts that (1) the time for which Plaintiffs seek compensation is not "compensable work time" under the FLSA; (2) the time at issue in this case is negligible and subject to the "de minimis doctrine;" and (3) substantial and accurate records have been kept in compliance with the FLSA. (*Id.*)

## DISCUSSION

## I.   DONNING AND DOFFING OF SANITARY AND SAFETY EQUIPMENT, EQUIPMENT CLEANING, AND KNIFE SHARPENING

A.    **Preliminary and Postliminary Versus Principal Work Activities Issue**

Defendant argues that the pace boners' and pace trimmers' donning and doffing of sanitary and safety equipment, equipment cleaning, and knife sharpening activities are not compensable work activities under the FLSA because they entail preliminary and postliminary work activities. (Def.'s Mem. at 10-12.) Plaintiffs, on the other hand, assert that these activities encompass principal work activities for which the pace boners and pace trimmers are owed compensation. (Pls.' Mem. at 10-13.)

Under the FLSA, employers must pay employees for time spent engaged in work. *See* 29 U.S.C. §§ 206, 207. The Supreme Court has long noted that "work" is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R Co. v. Muscoda Local No. 123,* 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed.949 (1944). The definition of "work" has been construed to include even those non-exertional activities. *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 89 L.Ed.118 (1944)("an employer . . . may hire a man to do nothing, or to do nothing but wait for something to happen").

The pace boners' and pace trimmers' donning and doffing of sanitary and safety equipment, equipment cleaning and knife sharpening constitute work because these activities are "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Muscoda,* 321 U.S. at 598, 64 S.Ct. 698, 88 L.Ed.949. Therefore, the Court finds that, as threshold matter, these activities constitute work.

The Court notes, however, that even though such activities constitute work, it does not necessarily mean that these activities are compensable. For instance, in 1947, Congress enacted the

Portal-to-Portal Act to clarify the duties of employers regarding the compensation of employees for activities that constitute work but which occur before, after, or during the work shift. *Anderson v. Pilgrim's Pride Corp.*, 147 F.Supp.2d 556, 562 (E.D. Tex. 2001). The Portal-to-Portal Act established two categories of activities which include those activities which are principal and those activities which are preliminary or postliminary. 29 U.S.C. § 254. An employer is not responsible for compensating employees for "activities which are preliminary or postliminary to [the] principal activity or activities" of a particular job.[18]  29 U.S.C. § 254(a)(2).

In determining if particular activities are compensable, the Supreme Court has noted that "activities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities." *Steiner v. Mitchell*, 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed.267 (1956); *see also Mitchell v. King Packing Co.*, 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed.267 (1956). In other words, "[a]n activity is integral to a principal activity if the activity is made necessary by the nature of the work performed, it fulfills mutual obligations between the employer and his employees, the activity directly benefits the employer in the operation

---

[18]A preliminary activity is one that is "engaged in by an employee before the commencement of his 'principal' activity or activities" and a postliminary activity is one that is "engaged in by an employee after the completion of his 'principal' activity or activities." 29 C.F.R. § 790.7(b). There is "[n]o categorical list of 'preliminary' and 'postliminary' activities except those named in the [Portal Act] . . . since activities which under one set of circumstances may be 'preliminary' or 'postliminary' activities, may under other conditions be 'principal' activities. (*Id.*) The Portal Act lists "[w]alking, riding or traveling to or from the actual place of performance of the principal activity or activities which [the] employee is employed to perform" as preliminary and postliminary activities. (*Id.*) Other types of non-compensable preliminary and postliminary activities also include: "checking in and out and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive pay checks." 29 C.F.R. § 790.8(g).

18

of his business, and the activity is closely related to other duties performed by the employees." *Hiner v. Penn-Harris-Madison Sch. Corp.*, 256 F.Supp.2d 854, 859 (N.D. Ind.2003)(*citing Steiner*, 350 U.S. at 252, 76 S.Ct. 330, 100 L.Ed.267). Thus, in order for a particular activity to be "integral and indispensable," it must be necessary to the principal activity performed and done for the benefit of the employer.[19] *Barrentine v. Arkansas-Best Freight Sys., Inc.,* 750 F.2d 47, 50 (8th Cir. 1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985).

Before a determination can be made as to "whether an activity is 'preliminary or postliminary to the principal activity or activities' which [an] employee is employed to perform, it is generally necessary to determine what [constitutes] the 'principal' activities." 29 C.F.R. § 790.8(a). As noted in *Riggs v. United States,* 21 Cl. Ct. 664, 669 (Ct. Cl. 1990), U.S. Department of Labor regulations do not provide a precise definition of what constitutes "principal activities." Rather, a number of descriptors and examples are cited at 29 C.F.R. § 790.8 which are drawn from both case law and legislative history. *Riggs,* 21 Cl. Ct. at 669. The regulation denotes, for example, that principal activities are those which an employee is hired to perform.[20] *Id.* Moreover, principal activities are

_____

[19]For example, 29 C.F.R. § 790.8(c) provides:

Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a "preliminary" or "postliminary" activity rather than a principal part of the activity. However, activities such as checking in and out and waiting in line to do so would not ordinarily be regarded as integral parts of the principal activity or activities.

[20]The regulations reference *Armour & Co. v. Wantock,* 323 U.S. 126, 65 S.Ct. 165, 89
(continued...)

not "limited to those activities which an employee predominantly performs." *Id.* at 668-69.  Thus, principal activities include "all activities which are an integral part of a principal activity."[21] (*Id. citing* 29 C.F.R. § 790.8(b).)

Defendant asserts that the time the pace boners and pace trimmers spend donning and doffing sanitary and safety equipment, equipment cleaning and knife sharpening constitute preliminary and postliminary activities which cannot be compensated based on relevant case law interpreting the Portal-to-Portal Act. For example, in *McComb v. C.A. Swanson & Sons*, 77 F.Supp. 716 (D. Neb. 1948), the court was asked to rule that the time spent by employees in a poultry packing company changing into and out of required smocks and uniforms was not preliminary and postliminary under the Portal-to-Portal Act.  In *McComb*, the employees would arrive at work before their scheduled shifts and change into the company uniform in a designated changing area. After their shifts, the employees would reverse the process. Each changing procedure took approximately five minutes.

---

[20](...continued)
L.Ed. 118 (1944) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). 29 C.F.R. § 29 C.F.R. § 790.8.  In these cases, the Supreme Court held that time spent waiting by employee firefighters (who worked for meat packing companies) for emergencies or other tasks could count towards overtime hours. Thus, the Supreme Court's discussion makes it clear that the relevant inquiry is fact-specific and focuses on the employer's purpose in hiring the employee.

[21]Two examples of what is meant by an integral part of a principal activity are as follows:

(1) In connection with the operation of a lathe an employee will frequently at the commencement of his workday oil, grease or clean his machine, or install a new cutting tool. Such activities are an integral part of the principal activity, and are included within such term.

(2) In the case of a garment worker in a textile mill, who is required to report 30 minutes before other employees report to commence their principal activities, and who during such 30 minutes distributes clothing or parts of clothing at the workbenches of other employees and gets machines in readiness for operation by other employees, such activities are among the principal activities of such employee.  29 C.F.R. § 790.8(c).

The *McComb* court found that even though these clothes changing activities were legally required so that the poultry packing company could engage in its business, they constituted preliminary and postliminary activities because putting on smocks and cleaning up after a shift did not constitute the principal work for which the company had hired the employees.[22] *McComb*, 77 F.Supp. at 720, 731-32.

Defendant cites to additional case law to support its proposition that the pace boners' and pace trimmers' activities which include donning and doffing sanitary and safety equipment, equipment cleaning as well as knife sharpening are not compensable work. For example, in *Pressley v. Sanderson Farms, Inc.*, No. Civ. A. H-00-420, 2001 WL 850017 (S.D. Tex. Apr. 23, 2001) even though the employees in a chicken processing plant were required to be on the production line, dressed and prepared to work, the district court, found as a matter of law, that the plaintiffs' claims for time spent donning and doffing (i.e., a smock, apron, cotton and/or rubber gloves, rubber sleeves, a hairnet and earplugs) as well as cleaning equipment were not compensable work because the activities in question constituted preliminary and postliminary activities which were not indispensable and integral to the employer. *Pressley*, 2001 WL 850017, at *2-3 n.3. Moreover, in *Anderson v. Pilgrim's Pride Co.*, 147 F.Supp.2d 556 (E.D. Tex. 2001), the district court found that the donning and doffing of sanitary and safety clothing and equipment (e.g., line employees wore a hairnet, ear plugs, rubber boots, an apron, a smock, and cotton and/or rubber gloves) by employees who worked for a poultry processing plant qualified as preliminary and postliminary activities for which employees were not entitled to compensation because these activities were not integral and

---

[22]For example, the *McComb* court stated that for a poultry eviscerator, the principal activity was the slaughter, dressing and cleaning of chickens. 77 F.Supp. at 732-33.

indispensable to the employees' principal jobs even though the employer and federal law required employees to wear the sanitary and safety clothing and equipment. *Anderson,* 147 F.Supp.2d at 559, 562-63.

The Court, however, notes that there is case law, which this Court finds more persuasive here, where courts have ruled that donning and doffing of safety equipment, equipment cleaning and knife sharpening constitute activities which are integral and indispensable to the principal work activity. For example, in *Reich v. IBP, Inc.,* 38 F.3d 1123, 1125 (10th Cir. 1994), the court held that donning, doffing and cleaning of special protective gear used by the knife-workers at the employer's plants was compensable. For instance, the knife-workers special safety equipment consisted of some combination of "a mesh apron, a plastic belly guard, mesh sleeves or plastic arms guards, wrist wraps, mesh gloves, a chain belt, a weight belt, a scabbard, and shin guards."[23] *IBP,* 38 F.3d at 1124-25. The court found that the items in question were heavy, cumbersome and required physical exertion, time and concentration to put on properly. *Id.* at 1126. Thus, the court noted that putting on the special protective equipment was not only work itself, but essential to the employees' work. *Id. See also Steiner v. Mitchell,* 350 U.S. 247, 250, 76 S.Ct. 330, 100 L.Ed. 267 (1956) (holding that the employees were entitled to compensation for changing clothes and showering due to the fact that they worked in a battery factory and were exposed to toxic chemicals.)

More recently, in *Alvarez v. IBP, Inc.,* 339 F.3d 894, 903 (9th Cir. 2003), the court held that the donning, doffing, washing and retrieving of protective gear by employees who worked in a meat processing plant were integral and indispensable to the employer's principal activity (i.e., processing beef, pork and related products). In general, employees wore all of or some combination of the

---

[23]Employees were also required to wear clean white outer garments while working. *Reich,* 38 F.3d at 1126.

following: a sanitary outer garment, some form of a plastic hard hat, a hair net, ear plugs, a face

shield or safety goggles, gloves (e.g., processing employees used a number of sets each day of grip-

facilitative and warmth-providing yellow cotton gloves and slaughter employees used yellow cotton

gloves and/or plastic or rubber gloves), liquid-repelling sleeves, aprons and leggings, safety boots

and shoes, and weight-lifting belts.[24] *Alvarez*, 339 F.3d at 898 n.2. The court, however, noted that

the time spent donning and doffing non-unique protective gear such as hard hats, frocks, ear plugs,

safety goggles and hair nets was not compensable. *Id.* at 901 n. 6, 903. *See also Mitchell v. King

Packing Co.,* 350 U.S. 260, 263, 76 S.Ct. 337, 100 L.Ed. 282 (1956)(holding that knife sharpening

activities of the employees outside their shifts were an integral part of and indispensable to the

various butchering activities for which they were principally employed).

   The Court finds that, under the facts presented in this case, a genuine issue of material fact(s)

exists with respect to whether the pace boners' and pace trimmers' donning and doffing of sanitary

and safety equipment, equipment cleaning, and knife sharpening activities constitute an integral and

indispensable part of Defendant's principal activities. For example, as demonstrated by the record,

a pork boner or pork trimmer typically utilizes the following sanitary and safety equipment: a helmet,

a frock (white smock), a plastic apron, an arm guard, a belly guard, a plastic arm sleeve, a variety

of gloves (i.e., cotton (optional), plastic (required, if direct contact with meat) and steel mesh), a

hook, a knife holder, a chida (a piece of steel used to straighten the edge of a  knife blade) and

knives.[25] (Def.'s Am. LR56.1(a)(3) St. ¶ 38; Pls.' Resp. to Def.'s Am. LR56.1(a)(3) St. ¶ 38;

_____

[24]The knife users also wore chain-link (i.e., mesh) metal aprons, leggings, vests, sleeves,
and gloves as well as plexiglass arms guards, Kevlar gloves and puncture-resistant protective
sleeves. *Alvarez,* 339 F.3d at 898 n.2.

[25]It also bears noting that a genuine, issue of material fact exists with respect to the issue
of knife sharpening. Specifically, the parties dispute whether the pace boners and pace trimmers
(continued...)

Gonzalez Dep. at 24-26, 28.)

### B.    The *De Minimis* Doctrine

Defendant avers that the amount of time the pace boners and pace trimmers spend donning

and doffing clothing and safety equipment, cleaning equipment and sharpening knives is *de minimis*

as a matter of law. (Def.'s Mem. at 15-16.)  Plaintiffs, on the other hand, assert that these activities

are not *de minimis* and should be compensated. (Pls.' Mem. at 15-17.)

Under the FLSA, "employees cannot recover for otherwise compensable time if it is *de*

*minimis*." *Lindow v. U.S.*, 738 F.2d 1057, 1062 (9th Cir. 1984). For instance, in *Anderson v. Mt.*

*Clemens Pottery Co.*, 328 U.S. 680, 693, 66 S.Ct. 1187, 90 L.Ed.1515 (1946), the Supreme Court

held that activities which involve "insubstantial and insignificant" periods of time are *de minimis*

and should "not be included in the statutory workweek." The Supreme Court noted in *Anderson* that:

> When the matter in issue concerns only a few seconds or minutes of work beyond the
> scheduled working hours, such trifles may be disregarded. Split-second absurdities
> are not justified by the actualities of working conditions or by the policy of the Fair
> Labor Standards Act. It is only when an employee is required to give up a substantial
> measure of his time and effort that compensable working time is involved. 328 U.S.
> at 692, 66 S.Ct. 1187, 90 L.Ed.1515.

In *Lindow,* the court set out four factors for determining whether an activity is *de minimis* as

a matter of law.[26] *Lindow,* 738 F.2d at 1062-63. The *Lindow* court initially noted that the first and

---

[25](...continued)
are responsible for or required to sharpen their knives between visits from Defendant's knife-
sharpening company. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 71-73.)

Defendant's somewhat related contention regarding an absence of proof of any
"compensable work" by laborers outside their shifts, was first raised in Defendant's reply brief.
It thus is not appropriate for consideration here. (Def.'s Reply at 3-4.)

[26]The four factors are: (1) the amount of daily time spent on the additional work; (2) the
(continued...)

"[a]n important factor in determining whether a claim is *de minimis* is the amount of time spent on the additional work. There is no precise amount of time that may be denied compensation as *de minimis*. No rigid rule can be applied with mathematical certainty." *Lindow*, 738 F.2d at 1062. *See also Frank v. Wilson & Co.*, 172 F.2d 712, 716 (7th Cir. 1949); *Nardone v. General Motors, Inc.* 207 F.Supp. 336, 341 (D.N.J.1962).

Defendant maintains that the instant case involves approximately six minutes (i.e., 5.921 minutes) per day for preliminary and postliminary activities and *that Lindow* noted that "[m]ost courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable." *Lindow*, 738 F.2d at 1062 (citing cases). (Def.'s Mem. at 15-16.) The Plaintiffs' evidence, however, as will be discussed, is that it takes the pace boners and pace trimmers 12.6 minutes a day to perform the subject activities and about an additional five minutes a day to sharpen their knives.[27]

The second factor that must be considered in determining whether otherwise compensable time is *de minimis* is "the practical administrative difficulty of recording the additional time." *Lindow*, 738 F.2d at 1063. *See* 29 C.F.R. § 785.47. In *Lindow*, the court stated, "[e]mployers . . . must compensate employees for even small amounts of daily time unless that time is so minuscule

---

[26](...continued)
administrative difficulty in recording the time; (3) the size of the aggregate claim; and (4) the regularity of the work. *Lindow*, 738 F.2d at 1062-63.

[27]It can be noted, too, that other case law establishes that "as little as ten minutes of working time goes beyond the level of de minimis and triggers the FLSA." *IBP*, 38 F.3d at 1126. *See also Reich v. Monfort, Inc.*, 144 F.3d 1329, 1332, 1333-34 (10th Cir. 1998)(holding that the employees preliminary and postliminary work which consisted of donning, doffing and cleaning protective equipment as well as knife cleaning which took about ten minutes each day was not de minimis); *Metzler v. IBP, Inc.*, 127 F.3d 959, 965-66 (10th Cir. 1997)(holding that fourteen minutes to don and doff safety equipment as well as clean equipment was not de minimis).

that it cannot, as an administrative matter, be recorded for payroll purposes." *Lindow*, 738 F.2d at 1063-64. Thus, in *Anderson*, the Supreme Court reasoned that overtime compensation for "a few seconds or minutes" is *de minimis* "in light of the realities of the industrial world." *Lindow*, 738 F.2d at 1063 (*quoting Anderson*, 328 U.S. at 692, 66 S.Ct. 1187, 90 L.Ed.1515. *See also IBP*, 38 F.3d at 1126 & n. 1 (time spent donning and doffing non-unique protective gear, "although essential to the job[ ] and required by the employer," is at once so insubstantial and so difficult to monitor that it "is *de minimis* as a matter of law").

The third factor that must be considered by a court is the aggregate amount of compensable time. *Lindow*, 738 F.2d at 1063. For instance, "[c]ourts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim." *Id.* at 1063. *See e.g., Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 95 (2d. Cir. 1953)(holding that less than $1.00 per week was not *de minimis*), *cert. denied,* 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed.384 (1953); *Glenn L. Martin Nebraska Co. v. Culkin,* 197 F.2d 981, 987 (8th Cir. 1952)(thirty minutes per day over a one and half year period was not *de minimis*), *cert. denied,* 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 671 (1952); *Landaas v. Canister Co.*, 188 F.2d 768, 771 (3rd Cir. 1951) ($21.67 to $256.88 per week over three years was not *de minimis*). Moreover, it is important to note that courts have also applied the *de minimis* rule "in relation to the total sum or claim involved in the litigation." *Lindow*, 738 F.2d at 1063 (citing cases). Therefore, if the aggregate claim is insubstantial, a court may dismiss it as "groundless and unreasonable." *Id.*

The fourth factor that must be considered in applying the *de minimis* rule is "whether the claimants performed the work on a regular basis." *Lindow*, 738 F.2d at 1063. *See e.g., Smith v. Cleveland Pneumatic Tool, Co.*, 173 F.2d 775, 776 (6th Cir. 1949)(unpaid working time was *de*

*minimis* where it was "not a daily occurrence"); *Hodgson v. Katz & Besthoff, #38, Inc.*, 365 F.Supp. 1193, 1197 (W.D.La. 1973)(court considered whether work "happened with a fair amount of regularity"). Moreover, "the uncertainty of how often employees performed the tasks and of how long a period was required for their performance are also relevant" in determining if the *de minimis* rule is satisfied. *Id.*

The Court finds that genuine issue(s) of material fact(s) exists with regard to whether the pace boners' and pace trimmers' donning and doffing of sanitary and safety equipment before and after shifts and during meal periods, equipment cleaning and knife sharpening activities are *de minimis*. First, as stated, the Court notes that the parties' experts dispute how much time it takes for these activities. For instance, Plaintiffs' expert, Ingalls, determined that it took 14.6 minutes per day (12.6 minutes, if walking time is excluded) to perform for the pace boners and pace trimmers to don and doff sanitary and safety equipment and clean their equipment while Defendant's expert, Swarts, found that these activities took only 5.921 minutes to perform each day. (Def.'s Am LR56.1(a)(3) St. ¶¶ 45, 46, Def.'s Exs. 16 & 17.) Moreover, Plaintiffs aver that it takes an additional approximately five minutes per day to sharpen their knives. (Cruz Dep. at 12; Llames Dep. at 37; Flores Dep. at 31.) Therefore, given the fact that the amount of daily time spent on these activities (i.e., the first factor to be considered in the *de minimis* analysis) is disputed and that relevant case law demonstrates, in some circumstances, that as little as ten or more minutes for these types of activities is not *de minimis*, this factor weighs heavily in Plaintiffs' favor.

In addition, with regard to the remaining three factors (i.e., the administrative difficulty in recording the time, the size of the aggregate claim and the regularity of the work), the Court finds that these factors also weigh in Plaintiffs' favor. For instance, when considering the administrative

27

difficulty in recording employees' time, the Kronos time-keeping system is able to record employees beginning and ending work times to the minute. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 12.) Next, with regard to the size of the aggregate claim, even though disputed by the parties, Plaintiffs have produced evidence indicating that approximately forty-five to forty-six pace boners and pace trimmers were not paid for their donning and doffing of sanitary and safety equipment, equipment cleaning and knife sharpening activities totaling 19.6 minutes (17.6 minutes, if walking time is excluded) per day. (Pls.' Mem. at 17; Def.'s Am LR56.1(a)(3) St. ¶ 45.) Furthermore, with regard to the last factor that must be considered, given the evidence in the case, the work performed by the pace boners and pace trimmers is clearly on a regular basis.

### C.    Section 203(o) Preclusion Claim[28]

Relying on Section 203(o) of the FLSA, Defendant contends that the collective bargaining agreement(s) between the parties precludes Plaintiffs' FLSA claims. (Def.'s Mem. at 7.) Specifically, Defendant maintains that the pace boners' and pace trimmers' preparatory and concluding activities (i.e., donning and doffing sanitary and safety equipment, equipment cleaning and knife sharpening activities) should not be compensated because a custom or practice, recognized by Section 203(o), has been established by the collective bargaining agreements which excludes compensation for these types of activities. (Id. at 7-10.) Defendant further asserts that relevant Seventh Circuit case law establishes that a collective bargaining agreement is a defense to liability under the FLSA. (Id. at 8-9.) Plaintiffs, on the other hand, aver that under relevant case law custom

---

[28]The Court initially notes that compensation for pure meal periods is prohibited by 29 C.F.R. § 785.19 ("Bona fide meal periods are not worktime.") (See also Def.'s Ex. 8, Nov. 1, 1997 - Oct. 31, 2000 Collective Bargaining Agreement at 3; Nov. 1, 2000 - Oct. 31, 2004 Collective Bargaining Agreement at 9.)

and practice is inapplicable, and the collective bargaining agreement is not a defense to liability herein; moreover, in any event, a custom or practice regarding non-compensation for preparatory and concluding activities has not been established, because the union refused to negotiate over this issue. (Pls.' Mem. at 9-10.) Rather, Plaintiff's contend that the union's refusal to bargain over the issue shows the opposite of a custom or practice. (*Id.* at 10.)

Section 203(o) of the FLSA contains an exclusion from compensable work time that provides:

> Hours Worked. – In determining for the purposes of sections 206 and 207 . . . the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective bargaining agreement applicable to the particular employee. 29 U.S.C. § 203(o).

The Court finds it unnecessary to reach the Defendant's custom and practice issue, because the Court finds that, as a matter of law, as Plaintiffs' argue, Section 203(o) does not apply. The reason why Section 203(o) is inapplicable is that the pace boners' and pace trimmers' donning and doffing of sanitary and safety equipment does not constitute "changing clothes" under Section 203(o).[29] (Pls.' Mem. at 5-8.) *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003) is directly on point on this issue. In *Alvarez*, employees in a meat processing plant instituted a class action suit against the employer *inter alia* for violations of the FLSA. The employees claimed that the employer was required to compensate them for the time it took to don and doff safety equipment. *Alvarez*, 339 F.3d at 899. The employer argued that Section 203(o) of the FLSA precluded the employees' claims.

---

[29]The Court notes also that the other categories Defendant characterizes as preparatory and concluding activities (namely, knife sharpening and equipment cleaning) clearly are not within the ambit of Section 203(o).

*Id.* at 3. In *Alvarez*, the court squarely addressed the issue of whether donning and doffing of safety equipment fell within the ambit of Section 203(o) and held that such activity does not fall within this statutory provision.

In reaching this conclusion, the *Alvarez* court considered whether donning and doffing of protective safety equipment constitutes "changing clothes" as the phrase is used in the statute. *Alvarez*, 339 F.3d at 904. The court initially noted that neither Section 203(o) nor its legislative history defined the phrase "changing clothes" and there was no case law that assessed the precise issue. *Id.* The Court ultimately concluded that the phrase "changing clothes" was to be given its "ordinary, contemporary, common meaning." *Id.* The court further noted that FLSA exemptions "are to be narrowly construed against the employers seeking to assert the them" (*Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)) and under this rule Section 203(o) does not apply unless the activity at issue "plainly and unmistakably" falls within the exemption's "terms and spirit." *Id.* at 905 (*citing Klem v. County of Santa Clara,* 208 F.3d 1085, 1089 (9th Cir. 2000)). The Court ultimately concluded that the protective safety equipment at issue did not "plainly and unmistakably" fit within Section 203(o) "clothing" term and the specialized protective equipment was different from that of typical clothing. *Id.* Therefore, the court determined that Section 203(o)'s "changing clothes" language meant something different from "donning required specialized personal protective equipment" and the lower court had correctly interpreted the "changing clothes" exception in Section 203(o) as not including the time spent putting on personal protective equipment. *Id.*

Having determined that *Alvarez* is persuasive, the Court finds that Section 203(o) does not apply to the pace boners' and pace trimmers' donning and doffing of sanitary and protective safety

equipment and that Section 203(o)'s custom and practice provision thus is not available to Defendant herein.[30]

## II.   GANG TIME

Defendant asserts that the pace boners and pace trimmers are paid on an hourly basis on "gang time" (i.e., the time the line is operating). (Def.'s Am. LR56.1(a)(3) St. ¶ 21.) Specifically, Defendant avers that pace boners and pace trimmers are paid by the hour and their hours are calculated based upon "gang time." (Def.'s Resp. to Pls.' Am. LR56.1(b)(3)(B) St. ¶ 78.) Moreover, some exceptions to "gang time" occur when employees are asked to do additional tasks (e.g., rework and additional boning). (*Id.*; Def.'s Reply at 7.)  Defendant further contends that "gang time" is generally recognized in the meat industry as a common measure of keeping time.  (Def.'s Mem. at 15.)  Therefore, according to Defendant, the pace boners and pace trimmers have their swipe in and swipe out times edited not for the purpose of cheating an employee out of wages, but for consistency in tracking working time on the line.  (Def.'s Mem. at 7.)

Plaintiffs, on the other hand, assert that based on the statements of Defendant's Director of Finance, Albert LaValle, and Defendant's Production Manager, Ron Mizaur, there is a conflict in the record regarding whether pace boners and pace trimmers are paid on a "gang time" basis or an hourly basis. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 78; Pls' Mem. at 13-14.) Moreover, Plaintiffs aver that if Defendant paid the pace boners and pace trimmers on a "gang time" basis, the employees'

---

[30]Defendant's citation to *Leahy v. City of Chicago,* 96 F.3d 228 (7th Cir. 1996), respectfully, is unavailing. *Leahy,* unlike here, addresses whether police officers should be paid for their meal period under the FLSA. There is no evidence that Section 203(o) herein invoked by Defendant, was in issue in *Leahy,* as the Court there never discussed its applicability. *See also Schwertfeger v. Village of Sauk Village,* No. 99 C 6456, 2001 WL 293115 (N.D. Ill. Mar. 23, 2001).

swipe in and swipe out times would be uniform; however, the punch detail exception reports indicate that employees' swipe in and swipe out times vary. (Pls.' Mem. at 14.)

In addition, Defendant maintains that the use of "gang time" is an industry standard. Plaintiffs counter that even *arguendo* if the Court accepts Defendant's facts regarding "gang time,""gang time," rather than being an industry standard, has been rejected in the case law (which Defendant disputes). Plaintiff thus requests that the Court reject the Defendant's reliance on the "gang time" concept.

Thus, the parties initially herein, essentially, seek to have the Court make a determination as to whether paying the pace boners and pace trimmers on a "gang time" basis is a violation of the FLSA. The Eight Circuit squarely addressed this issue in *Blum v. Schuyler Packing Co.,* 508 F.2d 881 (8th Cir. 1974). In deciding this issue, the Court found that the record in *Blum* was insufficient to grant the requested relief to plaintiffs or to defendants. *Blum,* 508 F.2d at 883. The Eight Circuit stated:

> It is apparent that the parties sought by the submission of the stipulation to have the district court rule that a 'gang time' method of computing compensable time was either valid or invalid, per se, under the [Fair Labor Standards Act]. However, the court went on to rule against the plaintiffs on the burden of proof issue. This, in effect, resulted in a holding that, since the plaintiffs were unable to get the defendants to stipulate to certain facts at issue in the case, they failed to carry their burden of proof. Such a result cannot be upheld. The stipulation did not contain enough facts for the district court to grant summary judgment in this case; therefore, it was error to do so. *Id.* at 883.

Moreover, the Court held that "the parties should be given the opportunity to present evidence on the facts which have not been agreed upon or to present additional stipulations." *Id.* at 883. The Eight Circuit ultimately vacated the judgment of the district court because summary judgment was granted "while there were still material facts in dispute." *Id. See also Power Equip. Co., v. U.S.,* 78

F.2d 1130 (6th Cir. 1985)(*relying on Blum v. Schuyler Packing Co.,* 508 F.2d 881 (8th Cir. 1974)).

The Court finds that the Court is unable to reach a disposition on this "gang time" entitlement issue because, as in *Blum,* there are "still material facts in dispute."

Moreover, a genuine issue of material fact exists as to whether the relevant employees are paid on a "gang time" or an hourly basis. Specifically, the parties dispute whether "gang time" is in fact used as the basis for paying the pace boners and pace trimmers. While Defendant avers that "gang time" is used to calculate the pace boners and pace trimmers wages, Plaintiffs point out that Defendant's Director of Finance, LaValle, stated that the pace boners and pace trimmers are paid on a "gang time" basis whereas Defendant's Production Manager, Mizaur, stated they are paid on an hourly basis. (Pls.' Am. LR56.1(b)(3)(B) St. ¶ 78.)

## III.   EDITING AND ROUNDING OF EMPLOYEES' TIME

Plaintiffs assert that they have been cheated out of thousands of minutes as a result of Defendant's systematic editing and rounding of employee's swipe in and swipe out times. (Pls.' Mem. at 3-4, 13-14; Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 40-44.) Specifically, with regard to the laborers, Plaintiffs state that if the laborers are paid on an hourly basis based on their swipe in and swipe out times, Defendant has no reason for manually changing their times. (Pls.' Mem. at 14.) Defendant, on the other hand, avers that editing and rounding of employee's times is permissible under the regulations; ergo, Plaintiffs' claim has no merit. (Def.'s Reply at 2-3, 10.) Thus, according to Defendant, the fact that the Kronos system has been programmed to prevent employees from punching in seven minutes prior to the start of a shift and rounds employees' time to the nearest quarter hour is both reasonable and permitted by law. (Def.'s Reply at 2-3.)

The applicable regulation at issue is as follows:

33

Section 785.48 Use of Time Clocks.

(a) Differences between clock records and actual hours worked. Time clocks are not required. In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded. *Minor differences between the clock records and actual hours worked cannot ordinarily be avoided, but major discrepancies should be discouraged since their raise a doubt as to the accuracy of the records of the hours actually worked.* (Emphasis added.)

(b) "Rounding" practices. It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. *For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.* 29 C.F.R. § 785.48 (Emphasis added.)

The Court finds, based on the record, that a genuine issue of material fact exist(s) with regard to whether Defendant's editing and rounding practices of employees' times are permissible. As demonstrated by the facts, even though disputed, Defendant's editing of employees' swipe in and swipe out times may, in fact, constitute major discrepancies between the actual hours worked by employees' (based on the exception report with punch detail) and the hours for which employees are paid (based on the punch detail report). And given Defendant's rounding practices and the fact that Plaintiffs' have documented thousands of minutes[31] for which employees have not been paid, a genuine issue of material fact exists as to whether the method by which the Kronos system rounds employees' times (i.e., to the nearest quarter hour) resulted in failing to compensate employees

---

[31]The Plaintiffs factual calculations of record, disputed by Defendant, are that Defendant's manual changing of swipe in and swipe out times has resulted in 18,223 minutes lost during one month in 1999, 16,856 minutes lost during one month in 2000, 33,609 minutes lost during a two month period in 2001, and 24,170 minutes lost in a one month period in 2002. (Pls.' Am. LR56.1(b)(3)(B) St. ¶¶ 41-44.)

properly for the time they have actually worked.  Accordingly, summary judgment is inappropriate with respect to this issue.[32]

## IV.    SECTION 301 PREEMPTION

Defendant avers that Plaintiffs' state law claims are preempted by Section 301 of the Labor Management Relations Act (hereinafter "LMRA") because their claims are founded on the rights created by the collective bargaining agreements and require an analysis of the terms of these agreements. (Def.'s Mem. at 4-6). 29 U.S.C. § 185(a).  Plaintiffs, on the other hand, aver that their state law claims are not preempted because the language in the collective bargaining agreements regarding overtime compensation is straightforward; therefore, the Court does not need to employ an analysis of the agreements. (Pls.' Mem. at 18-19.)

The Supremacy Clause of Article VI of the United States Constitution grants Congress the power to preempt state law. *Kohl's Food Stores, Inc. v. Hyland*, 32 F.3d 1075, 1077 (7th Cir. 1994). Congress exercised this power by enacting Section 301(a) of the LMRA which states:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. 29 U.S.C. § 185(a).

Section 301 confers federal jurisdiction over controversies that arise out of collective bargaining agreements and also "authorizes federal courts to fashion a body of federal law for the enforcement

---

[32]The Court also finds that a genuine issue of material fact(s) exists as to whether Defendant complied with the FLSA substantial and accurate record keeping requirements as provided by 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2(a)(7). Specifically, a genuine issue of material fact exists as to whether the Defendant, by requiring the pace boners and pace trimmers to swipe in after donning their sanitary and safety equipment and swipe out before doffing and cleaning their sanitary and safety equipment, has failed to properly measure these employees' time, in violation of the FLSA record keeping requirements. *See e.g., Metzler v. IBP, Inc.*, 127 F.3d 959, 965 (10th Cir. 1997).

of these collective bargaining agreements." *Loewen Group Int'l, Inc. v. Haberichter,* 65 F.3d 1417,

1421 (7th Cir. 1995)(*citing Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 403, 108 S.Ct.

1877, 100 L.Ed.2d 410 (1988)). Thus, in order to ensure the uniform interpretation of collective

bargaining agreements, Section 301 preempts state law claims that touch on its subject matter:

"issues raised in suits of a kind covered by § 301 [are] to be decided according to the precepts of

federal labor policy." *Allis-Chalmers Corp. v. Luek,* 471 U.S. 202, 209, 105 S.Ct. 1904, 85 L.Ed.2d

206 (1985)(*quoting Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 104, 82 S.Ct. 571, 7 L.Ed.2d 593

(1962))(internal quotations marks omitted).

Whether Section 301 operates to preempt a state law claim entails a "case-by-case factual

analysis." *In re Bentz Metal Prods. Co.,* 253 F.3d 283, 285 (7th Cir. 2001). However, not every

dispute that tangentially involves a provision of a collective bargaining agreement is preempted by

federal law. *Allis-Chalmers,* 471 U.S. at 211, 105 S.Ct. 1904, 85 L.Ed.2d 206. Thus, preemption will

not occur if a dispute merely references or requires consultation of a collective bargaining agreement.

*Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *In re Bentz,* 253

F.3d at 285. Preemption is triggered when a claim is "founded directly on rights created by collective

bargaining agreements," (*Caterpillar, Inc. v. Williams,* 482 U.S. 386, 394, 107 S.Ct. 2425, 96

L.Ed.2d 318 (1987)) and when the resolution of a state law claim "depends on the meaning of, or

requires the interpretation of, a collective bargaining agreement." *Loewen Group Int'l, Inc.,* 65 F.3d

at 1421 (*citing Lingle,* 486 U.S. at 405-06, 407, 409-10, 108 S.Ct. 1877, 100 L.Ed.2d 410). Put

differently, a claim is preempted if it is "substantially dependent on analysis of a collective-

bargaining agreement." *Atchley v. Heritage Cable Vision Assocs.,* 101 F.3d 495, 499 (7th Cir.

1996)(citations omitted). If the meaning of a contract term is at the heart of the dispute, Section 301

will have preemptive effect. *Livadas*, 512 U.S. at 124; *Caterpillar*, 482 U.S. at 394. Thus, "[e]ven

if explicit terms of the collective bargaining agreement may not be on point, it is a matter of federal

contract interpretation whether the words of a collective bargaining agreement create implied rights."

*Atchley*, 101 F.3d at 499. Therefore, "if it is necessary to interpret express or implied terms of a

[collective bargaining agreement], a state law claim is deemed federal in nature." *Id.*

      The Supreme Court has stated, though, that "'when the meaning of contract terms is not the

subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course

of state-law litigation plainly does not require the claim to be extinguished.'" *Loewen*, 65 F.3d at

1421 (*quoting Livadas*, 512 U.S. at 124, 114 S.Ct. 2068, 129 L.Ed.2d 93); *see also Milne Employees*

*Ass'n v. Sun Carriers*, 960 F.2d 1401, 1409-10 (9th Cir. 1991), *cert. denied*, 508 U.S. 959, 113 S.Ct.

2927, 124 L.Ed.2d 678 (1993). The Supreme Court further stated that "'it is the legal character of

a claim, as 'independent' of rights under the collective-bargaining agreement that decides whether

a state cause of action may go forward'" and also noted that "'§ 301 cannot be read broadly to pre-

empt nonnegotiable rights conferred on individual employees as a matter of state law.'" *Loewen*, 65

F.3d at 1421 (*quoting Livadas*, 512 U.S. at 123-24, 114 S.Ct. 2068, 129 L.Ed.2d 93)(citations

omitted). Instead,

      the pre-emption rule has been applied to assure that the purposes animating § 301
      will be frustrated neither by state laws purporting to determine 'questions relating
      to what the parties to a labor agreement agree, and what legal consequences were
      intended to flow from breaches of that agreement,' nor by parties' efforts to renege
      on their arbitration promises by 'relabeling' as tort suits actions simply alleging
      breaches of duties assumed in collective-bargaining agreements. *Loewen*, 65 F.3d at
      1422 (*quoting Livadas*, 512 U.S. at 123-24, 114 S.Ct. 2068, 129 L.Ed.2d 93.
      (citations omitted).

      Defendant cites to *Lopez v. Smurfit-Stone Container Corp.*, No. 02 C 7347, 2003 WL 297533

(N.D. Ill. Feb. 10, 2003) as support for its argument that Plaintiffs' state law claims are preempted.

In *Lopez,* the plaintiffs brought a state law claim against the employer alleging that they had not been paid overtime wages pursuant to the Illinois Wage Payment and Collection Act (hereinafter "IWPCA"). Specifically, the collective bargaining agreement at issue provided that employees were entitled to overtime pay for "hours worked over eight (8) hours per day and for any work performed outside a worker's regular shift." *Lopez,* 2003 WL 297533, at *1. The court found that the plaintiffs' claim was predicated on the rights created by the collective bargaining agreement because "no state law creates the right to payment of overtime wages for work performed outside of a regular shift. This entitlement exists in this case only by virtue of the collective bargaining agreement. It is the agreement that is at the heart of the dispute." *Id.* at *3. The court further held that an interpretation of the collective bargaining agreement was necessary because the real issue which required resolution was whether the employees had performed the type of work that would entitle them to overtime wages in the first place. *Id.* at *4. Accordingly, the court found that the employees state law claim was preempted by Section 301. *Id.* at *5.

Plaintiffs argument in response to Defendant's Section 301 preemption argument is that, unlike *Lopez,* the overtime provision of the collective bargaining agreements herein is straightforward, involves no interpretation and does not require any analysis of the collective bargaining agreements. (Pls.' Mem. at 18, 19.) The Court disagrees. The collective bargaining agreements herein provide that "[a]ll work in excess of eight (8) hours in any one (1) day or forty (40) hours in any one (1) week shall be paid for at one and one-half (1-1/2) times the regular rate of pay."[33] (Def.'s Ex. 8, Nov. 1, 1997 - Oct. 31, 2000 Collective Bargaining Agreement at 2; Nov. 1,

---

[33]The collective bargaining agreements also contain provisions *inter alia* as to the workday defined, providing of equipment and knife sharpening, guaranteed workweek and meal periods.

2000 - Oct. 31, 2004 Collective Bargaining Agreement at 8.)  Like *Lopez,* the Plaintiffs' claims as framed by the briefs, are predicated on the rights created by the collective bargaining agreements, and depend on the meaning of, or require an interpretation, of the collective bargaining agreements.[34]

Additionally, the Court having implicitly concluded that Plaintiffs' sole cause of action lies under Section 301, Plaintiffs' state law claims must be dismissed, as Defendant argues, because Plaintiffs have not alleged that they have exhausted all administrative remedies. The exhaustion of administrative remedies is a procedural prerequisite to maintaining a Section 301 action. *Smith v. Colgate-Palmolive Co.,* 943 F.2d 764, 771 (7th Cir. 1991). Thus, before filing suit, federal labor policy dictates that an employee is "[o]rdinarily . . . required to attempt to exhaust any grievance or arbitration remedies provides in the collective bargaining agreement." *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281, 76 L.Ed.2d 476 (*citing Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965)); *Smith,* 943 F.2d at 771. In order to avoid the requirement of administrative exhaustion, an employee must establish a breach of the union's duty of fair representation. *DelCostello,* 462 U.S. at 164-65, 103 S.Ct. 2281, 76 L.Ed.2d 476.

The Court finds that, as to its state law claims, Plaintiffs have failed to exhaust all administrative requirements as set forth in the collective bargaining agreements.  Specifically, the current collective bargaining agreement provides that a grievance shall be filed "within 10 days from the time the aggrieved party acquired knowledge or reasonably should have acquired knowledge of the alleged violation."[35] (Def.'s Ex. 8, Nov. 1, 2000 - Oct. 31, 2004 Collective Bargaining

---

[34]Plaintiffs have, essentially, implicitly acknowledged same in their response memorandum. (Pls.' Mem. at 5.)

[35]The November 1, 1997 - October 31, 2000 collective bargaining agreement contains similar language. (Def.'s Ex. 8, Nov. 1, 1997 - Oct. 31, 2000 Collective Bargaining Agreement (continued...)

Agreement at 27). Moreover, failure to comply with the time limits set forth in the collective bargaining agreement mandates a waiver of the right to pursue the grievance.[36] (*Id.*)

The undisputed facts in the case show that Plaintiffs have not filed a grievance on the basis of the state law allegations made in the Amended Complaint. (Def.'s Am. LR56.1(a)(3) St. ¶ 11; Pls.' Resp. to Def.'s Am. LR56.1(a)(3) St. ¶ 11.) Accordingly, Plaintiffs have failed to exhaust the administrative remedies provided by the collective bargaining agreements and they cannot not now maintain a Section 301 action.

In sum, the Court finds that Plaintiffs' state law claims must be dismissed because they are preempted by Section 301 of the LMRA.

<u>CONCLUSION</u>

In view of the foregoing, Defendant's motion for summary judgment is granted as to Plaintiffs' state law claims and denied as to Plaintiffs' FLSA claims.

ENTER:

**IAN H. LEVIN**
**United States Magistrate Judge**

Dated:  December 19, 2003

———————————

[35](...continued)
at 13.)

[36]The November 1, 1997 - October 31, 2000 collective bargaining agreement contains similar language. (Def.'s Ex. 8, Nov. 1, 1997 - Oct. 31, 2000 Collective Bargaining Agreement at 13.)